**ALAMEDA NEWSPAPERS, INC.,**
**Plaintiff–Appellee,**

v.

**CITY OF OAKLAND, et al.,**
**Defendants–Appellants,**

**Northern California Newspaper Guild,**
**Local 52, Newspaper Guild,**
**Intervenor–Appellant.**

**No. 94–16513.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1995.

Decided Sept. 13, 1996.

---

venor-appellant Northern California Newspaper Guild, Local 52.

Before: BOOCHEVER and REINHARDT, Circuit Judges, and KING, District Judge.*

REINHARDT, Circuit Judge:

Today we decide whether preemption law compels a City, against its wishes, to patronize a newspaper company embroiled in a bitter and divisive labor dispute with its employees. Our answer is that it does not. Specifically, we hold that the City of Oakland may determine as a matter of principle not to do business with Alameda Newspapers, Inc. during the course of a labor boycott, and that the City Council may suggest that the residents of Oakland do likewise. Although a City cannot regulate in an area governed by federal labor law or that Congress intended to be controlled solely by market forces, the City did not act in a regulatory manner in this case. The City Council simply proclaimed its views regarding the plight of the work force of the Oakland Tribune, announced its concern over the substantial loss of jobs both to the City and at the newspaper, and went on public record in support of the boycott. It also used its moral suasion to urge its citizens to back the boycott. Finally, the City determined to cancel its thirteen-odd subscriptions to the newspaper and to place its official advertising in other publications in the future. The district court held, on summary judgment, that the City's actions were preempted and issued an injunction. We disagree. Accordingly, we reverse the judgment and vacate the injunction.

## I. Background

In the fall of 1992, Alameda Newspapers, Inc. (ANI) purchased the Oakland Tribune, terminated the paper's contracts with ap-

Paul H. Duvall, King & Ballow, San Diego, CA, for plaintiff-appellee Alameda Newspapers, Inc.

Duance B. Beeson, Beeson, Tayer & Bodine, San Francisco, CA, for defendant-inter-

* The Honorable Samuel P. King, Senior District Judge for the District of Hawaii, sitting by desig- nation.

proximately nine unions, and dismissed more than 400 of the Tribune's 600 employees. It also moved the printing operation out of Oakland and relocated it to Hayward, California. In April of 1993, the Newspaper Guild [1] and other unions comprising the Conference of Newspaper Unions launched a boycott of the Tribune and the other Alameda Newspaper Group publications with the help of the Alameda Central Labor Council, an affiliate of the AFL–CIO.[2] Backers of the boycott appealed to the community for support. As part of its campaign, the Guild asked the Oakland City Council to endorse the boycott and terminate the City's business relationship with the Tribune.

On September 14, 1993, the Council passed the resolution that is at the heart of this appeal, No. 70367 C.M.S. That resolution reads:

A RESOLUTION ENDORSING THE BOYCOTT OF THE OAKLAND TRIBUNE AND OTHER ALAMEDA NEWSPAPER GROUP PUBLICATIONS UNTIL THE LABOR DISPUTE IS RESOLVED

WHEREAS, last fall, Texas-based Garden State Newspapers, Inc., publisher of Alameda Newspaper Group publications, purchased the Oakland Tribune, ending a century-long tradition of hometown ownership of the Tribune, and

WHEREAS, the City of Oakland has in the past designated the Oakland Tribune as the newspaper of record for the City of Oakland's official notices; and

WHEREAS, the Oakland Tribune is no longer printed and published in the City of Oakland as is required by City Charter of the City's newspaper of record; and

WHEREAS, the new owners of the Oakland Tribune have embarked on a course of anti-labor conduct, including:

Eliminating some 500 Oakland jobs at the time of purchase of the Tribune, and eliminating some 130 jobs at the time of the initial purchase of ANG;

Refusing to recognize the jurisdiction of Teamsters Mailers Local 15 and Drivers Local 296;

Refusing after six years at the bargaining table to settle a first contract with [the Guild] for editorial employees at five ANG publications;

Offering at the bargaining table less than one-half the journeyman pay rate for experienced editorial employees; refusing to guarantee health and welfare coverage to these employees, and refusing to agree to union security provisions that are standard in California private sector contracts; and

Issuing a falsified government document after Cal/OSHA investigated the high incidence of job injury complaints in ANG newsrooms; and

WHEREAS, the Central Labor Council of Alameda County, AFL–CIO has initiated a boycott of the Oakland Tribune and other Alameda Newspaper Group publications; now, therefore, be it

RESOLVED: That the City of Oakland open up the process to select the official newspaper of the City; and, be it

FURTHER RESOLVED: That the Oakland City Council endorse the boycott of the Oakland Tribune and other Alameda Newspaper Group publications; and, be it

FURTHER RESOLVED: That the City Council urges all citizens of Oakland to stop purchasing and advertising in the Oakland Tribune and Alameda Newspaper Group publications until the labor dispute is successfully concluded.

Immediately after adopting the resolution, the council passed a separate voice resolution directing City officials to discontinue all official advertising in the Tribune and to cancel the City's subscriptions to that newspaper. In all, the City cancelled about 13 subscriptions. The projected loss of the City's advertising was approximately $40,000 per year in gross revenue, although due to an earlier

---

**1.** Throughout this opinion we use the designation Newspaper Guild or Guild to refer to the Northern California Newspaper Guild, Local 52, Newspaper Guild.

**2.** The City of Oakland is located in Alameda County, California.

resolution the advertising might have been discontinued in any event.[3]

ANI filed an action later that month, naming the City, the council, and the council members as defendants. ANI alleged that the two resolutions were preempted by the National Labor Relations Act, 29 U.S.C. §§ 151–169, and the Supremacy Clause. It also contended that the City had violated 42 U.S.C. § 1983 by depriving ANI of its rights under the First and Fourteenth Amendments of the U.S. Constitution. ANI sought injunctive, declaratory, and monetary relief, including $5 million in punitive damages. The Newspaper Guild submitted an amicus brief in support of the City.

The parties filed cross-motions for summary judgment. On April 29, 1994, the court issued an Opinion and Order in favor of ANI. The court did not enter judgment, however, pending a status conference on the issue of damages. The parties subsequently settled that issue and the question of attorneys' fees themselves. On July 27, 1994, the Court entered the Amended Opinion and Order that is the subject of this appeal.

In its amended opinion, the court held that the resolutions were regulatory rather than proprietary, and thus subject to preemption. The court then turned to whether the resolutions were preempted under *Garmon* or *Machinists*.[4] The court found that the resolutions were violative of *Machinists* because they were "an attempt by the City to interfere in the 'free play of economic forces.'" Although the court appeared to find *Garmon* preemption, as well, it noted that it "need not go so far as to find preemption under *Garmon*, because of the clear application of the *Machinists* doctrine." After concluding that the City was not sufficiently "interested" in the labor dispute to come within the Norris–LaGuardia Act's prohibition on injunctions, the court permanently enjoined the defendants from endorsing the boycott as well as from 1) replacing the Tribune as the newspaper of record for the City's official notices; 2) cancelling Tribune subscriptions; or 3) purchasing any print media advertising space or subscriptions for the City in a publication other than the Tribune "because of any labor dispute subject to the NLRA and involving [ANI]." The court also ordered the defendants to reinstate Tribune subscriptions that they had cancelled because of the labor dispute.

After the issuance of the court's original Opinion and Order, but before the entry of the final order, the Guild moved to intervene as a defendant. The court granted the motion, and the Guild subsequently filed a timely notice of appeal of the final judgment. The City defendants did not appeal.

## II. A Preliminary Matter

 ANI argues that the Guild cannot meet the actual injury requirement of Article III and urges us to dismiss this appeal for lack of jurisdiction. ANI contends that the legal dispute was between ANI and the City, and that the court's decision and the accompanying injunction did not affect the Guild directly. Thus, ANI argues, the Guild cannot show that it has "suffered some actual injury that can be redressed by a favorable judicial decision," *GTE California, Inc. v. F.C.C.*, 39 F.3d 940, 945 (9th Cir.1994).[5]

---

**3.** When ANI moved the printing operation of the Tribune from Oakland to Hayward, it jeopardized the paper's status as Oakland's official paper because the City Charter states that the City's official newspaper must be printed and published within City limits. On July 6, 1993, largely in response to ANI's decision to print the paper outside the City limits, the council passed Resolution No. 70185. That resolution continued the Tribune's designation as Oakland's official newspaper but placed the City's advertising contract with the Tribune on a month-to-month basis. The resolution also stated that "other daily and periodical publications may also be used as required for official advertising and recruitment." ANI is not challenging that resolution. Nor is ANI claiming that the actions it contests here constitute a violation of its month-to-month contract with City of Oakland.

**4.** *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).

**5.** If ANI were correct that the Guild did not have standing to maintain this action because the Guild could not establish injury-in-fact, we would not have jurisdiction to consider this appeal. Moreover, we would be required to determine whether the Guild had standing, whether or not

We have no doubt that the Guild has a sufficiently direct stake in the conflict and in the district court's decision to satisfy the injury requirement of Article III. The Guild has as much at stake in the litigation as either the plaintiff or the defendants. It is the Guild's boycott that is the source of the dispute between the parties. Under the district court's rationale the Guild is barred from seeking support for its boycott not only from the City of Oakland but from any state, county, city or other unit of government. As a result of the court's order, the City is required to patronize a business that is being boycotted by workers the Guild represents.[6] The Guild's interest in the outcome of the litigation is not just abstract, but immediate and tangible.

The Guild can meet Article III's "standing criteria by alleging a threat of particularized injury from the order [it] seek[s] to reverse that would be avoided or redressed if [its] appeal succeeds," *Legal Aid Society of Alameda County v. Brennan,* 608 F.2d 1319, 1328 (9th Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). The Guild has clearly alleged a particularized injury, and there is no doubt that a favorable court decision would redress its injuries. *See Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

We note that there is no other bar to our finding that the Guild satisfies Article III's standing requirements.[7] Accordingly, we reject ANI's claim that we should dismiss this appeal for lack of jurisdiction and turn to the merits.[8]

## III. Preemption Principles That Guide Us

The Supreme Court has recognized two types of preemption under the NLRA. Both are judicially created doctrines. *Garmon* preemption, set forth in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), prohibits States from *regulating* "activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Golden State Transit v. City of Los Angeles,* 475 U.S. 608, 613–14, 106 S.Ct. 1395, 1398–99, 89 L.Ed.2d 616 (1986) (emphasis added). Specifically, *Garmon* preemption forbids state and local regulation of activities that are "protected by § 7 of the [NLRA] or constitute an unfair labor practice under § 8." *Garmon,* 359 U.S. at 244, 79 S.Ct. at 779. *Garmon* preemption is "intended to preclude state interference with the National Labor Relation Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA." *Golden State*

---

ANI raised the issue, because federal courts are under an independent obligation to determine that jurisdiction is proper in any case before them. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990).

6. Under the terms of the injunction the City may, however, cancel its subscription or withhold its advertising if it has a reason for doing so that is not based on the existence of the labor dispute.

7. ANI does not claim that the Guild failed to meet any other standing requirement, whether constitutional or jurisprudential, and we can conceive of no sound argument for concluding that it did.

8. In its brief, ANI also challenges the district court's decision to permit the Guild to intervene as of right under Fed.R.Civ.P. 24(a). Since ANI did not file a cross appeal (or even a motion to dismiss), it is probably not entitled to have us address the merits of its contention. (*See* the "inveterate" rule that holds that "a party who

does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party.") *Massachusetts Mutual Life Ins. Co. v. Ludwig,* 426 U.S. 479, 481, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784 (1976) (*quoting United States v. American Ry. Exp. Co.,* 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924)); *cf. Peoria & Pekin Union Ry. v. United States,* 263 U.S. 528, 44 S.Ct. 194, 68 L.Ed. 427 (1924). However, we need not decide that question here because ANI's principal attack on the order permitting intervention is that the Guild lacked standing, and we have already rejected that argument. In any event, the Guild's right to intervene for the purpose of appealing is well established. *See Yniguez v. State of Arizona,* 939 F.2d 727 (9th Cir.1991), *cert. granted,* — U.S. —, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996); *Legal Aid Society of Alameda County v. Brennan,* 608 F.2d 1319, 1328 (9th Cir.1979); *Pellegrino v. Nesbit,* 203 F.2d 463 (9th Cir.1953); *see also United Airlines, Inc. v. McDonald,* 432 U.S. 385, 394–95 & n. 16, 97 S.Ct. 2464, 2469–70 & n. 16, 53 L.Ed.2d 423 (1977).

*Transit,* 475 U.S. at 613, 106 S.Ct. at 1398 (internal quotation marks omitted).

■■■ *Machinists* preemption, set forth in *Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), prohibits state *regulation* of areas that Congress left "to be controlled by the free play of economic forces." *Id.* at 140, 96 S.Ct. at 2553. *Machinists* preemption is based on the premise that "the use of economic pressure by the parties to a labor dispute is … part and parcel of the process of collective bargaining," and thus holds that neither a state nor the National Labor Relations Board is "afforded flexibility in picking and choosing which economic devices of labor and management shall be branded unlawful." *Id.* at 144, 149, 96 S.Ct. at 2555, 2557 (internal citations omitted). "Whether self-help economic activities are employed by the employer or the union, the crucial inquiry regarding preemption is the same: whether the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes." *Golden State Transit,* 475 U.S. at 615, 106 S.Ct. at 1399. "*Machinists* preemption preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." *Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.,* 507 U.S. 218, 226, 113 S.Ct. 1190, 1195, 122 L.Ed.2d 565 (1993) ("*Boston Harbor*").

■■■ A prerequisite to preemption under either *Garmon* or *Machinists* is a finding that the state or local action in question constitutes *regulation* of labor relations between employers and employees. *Boston Harbor,* 507 U.S. at 226–33, 113 S.Ct. at 1196–99. If a municipality's action does not rise to the level of regulation, it is not preempted. A common theme in preemption cases is the coercive nature of the conduct undertaken by the governmental entity. State or local action is not deemed preempted unless it has a "real effect on federal rights." *Livadas v. Bradshaw,* 512 U.S. 107, ——, 114 S.Ct. 2068, 2076, 129 L.Ed.2d 93 (1994).

■■■ For purposes of preemption law, regulation includes more than the traditional enactment of laws, ordinances, rules, and other legislative and administrative measures. It includes, among other things, certain judicial actions.[9] We must determine here whether the Oakland City Council's adoption of either the written resolution or the oral resolution was a regulatory act.

■■■ Our decision whether the Oakland City Council's resolutions constitute "regulation" of labor relations and whether they are barred by either *Garmon* or *Machinists* is strongly influenced by a guiding principle that emerges from applying two basic precepts of preemption law. Those precepts are: First, the "purpose of Congress is the ultimate touchstone" of preemption analysis, *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978). Second, "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). These two precepts, but particularly the latter, have led the Court to declare: "We are reluctant to infer preemption," *Boston Harbor,* 507 U.S. at 224, 113 S.Ct. at 1194. It is in light of that principle mandating judicial, indeed federal, restraint that we examine the issue before us.

## IV. Order of Analysis

Because this lawsuit concerns two separately adopted resolutions of the City Council, one written, one oral, we will apply preemption analysis to each resolution in turn. We begin by considering the City's written

---

**9.** In two landmark preemption cases, the Court has held that state courts may not enjoin peaceful picketing by employees trying to pressure their companies into signing union agreements, *San Diego Building Trades Council v. Garmon,* 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957), and later that state courts may not award an employer damages under state tort law for injuries caused by such picketing, *San Diego Building Trades Council, etc. v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

resolution. First, we address whether preemption principles prohibit a City from announcing that it supports a boycott called by workers engaged in a labor dispute with their employer. Second, we consider whether a City may lawfully suggest that City residents do likewise. Next, we consider the voice resolution that the council passed immediately afterwards. That resolution also raises two questions: first, whether preemption law requires the City to maintain its minimal number of subscriptions to a newspaper actively embroiled in a labor dispute with its employees; second, whether that doctrine compels the City to continue to advertise in such a publication.

## V. The Written Resolution

■ The written resolution is in essence a declaration of principle or conscience. In it, the council announces its support for the boycott and urges Oakland's citizens to back the workers' action. The resolution has no binding force on anyone. It is in this respect an expressive resolution akin to political speech.[10]

Cities, counties, and states have a long tradition of issuing pronouncements, proclamations, and statements of principle on a wide range of matters of public interest, including other matters subject to preemption, such as foreign policy and immigration.[11] We are not aware of any case in which a court has ever held that a local government is preempted by federal law from making such statements or adopting such proclamations, let alone has enjoined state or local officials from engaging in such expressive conduct.

Even assuming that under some circumstances speech by a governmental agency might attain coercive power, the council resolution at issue does not constitute that type of speech.[12] The resolution here is clearly expressive in nature. It constitutes a declaration of principle, rather than an exercise of governmental powers. For that reason, it is different from the type of legislation that was held to be regulatory when the Fifth Circuit enjoined enforcement of a state statute governing labor disputes that provided for compulsory fact finding by a state agency, the issuance by that agency of a definitive official report regarding the cause of the dispute, and the official assignment of responsibility or blame for its origin and continuation. *General Electric Co. v. Callahan*, 294 F.2d 60 (1st Cir.1961), *cert. dismissed*, 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962); *Grand Rapids City Coach Lines v. Howlett*, 137 F.Supp. 667 (W.D.Mich.1955) (same). The Oakland City Council did not exercise the type of "limited direct coercive power ... [with] indirect coercive effect" found by the Fifth Circuit. Its resolution did not invoke the exercise of a governmental function—the

---

**10.** Although the resolution appears to require the City to take one tangible action—opening up the process to select the official City newspaper—the council had already decided to do that in a previous resolution. *See supra* note 3.

**11.** *See, e.g., Board of Trustees of Employees' Retirement System of City of Baltimore v. Mayor and City Council of Baltimore City*, 317 Md. 72, 562 A.2d 720 (1989), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990) (holding that city ordinance requiring that city pension funds divest their holdings in companies doing business in South Africa did not intrude on federal government's exclusive power to conduct foreign policy). Numerous state and local entities, including public universities, adopted similar policies. *See also,* Howard N. Fenton, III, *The Fallacy of Federalism in Foreign Affairs: State and Local Foreign Trade Restrictions*, 13 Nw. J.Int'l L. & Bus. 563, 592 n. 1 (1993).

**12.** This court has previously declined to extend preemption analysis to an official pronouncement by a governmental body on an area of traditional local concern even though that pronouncement might well have affected the course of a labor dispute. In *Washington State Nurses Association v. Washington State Hosp. Commission*, 773 F.2d 1044, 1045, 1047 (9th Cir.1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986), we held that efforts by the Washington State Hospital Commission to control rising hospital rates were not preempted even though those efforts had the potential of influencing negotiations between the nurses association and the hospitals. Although our decision rested largely on the state's recognized right to control hospital rates, we also suggested that preemption should not extend to public statements. We stated that the Commission's "public pronouncements" concerning the appropriate level of wage increases for nurses were not preempted because they "do not impose sanctions on either the union or the employer with respect to collective bargaining negotiations." *Id.* at 1047.

conducting of a formal investigation and the issuance of formal findings. In the words of the Fifth Circuit, the Oakland City Council's resolution was "limited to editorial comment." *General Electric,* 294 F.2d at 67. As such, the City's speech is not preempted.

■ There is a second reason that leads us to conclude that the written resolution is not preempted. Holding that cities are preempted under federal labor law, or under any other federal law, from making pronouncements on matters of public interest, including labor disputes, would mark an unprecedented and extraordinary intrusion into the rights of state and local governments. An inherent power of any sovereign government and one that is fundamental to any form of democracy is the ability to communicate with the citizenry. We have been furnished with no evidence that in adopting a comprehensive national labor policy Congress intended to prohibit state and local governments from making pronouncements about labor disputes of concern to their communities or to prohibit those bodies from advising their constituents of their positions on such matters. Absent explicit direction from Congress, we are not willing to conclude that our federal government has chosen to adopt a rule that is so antithetical to fundamental principles of federalism and democracy.

■ The preemptive effect of Congress' actions must be read as being subject to reasonable limitations. That is clear from *Garmon*'s discussion of the extent to which even *regulatory* conduct is in some instances excepted. In *Garmon,* the Court said: "due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us *not* to find withdrawal from the States of the power to regulate ... where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 779 (emphasis added). We believe that those same principles of

federalism operate even more strongly when we are considering resolutions expressing *opinions* on matters of interest to the local community. In short, we believe that those principles require us to conclude that Congress did not intend to prohibit state and local governments from adopting resolutions of the type before us.

■ We next consider whether a different analysis applies to the part of the resolution in which the City Council urges the citizens of Oakland to endorse the boycott. We hold that the answer is no, for several reasons. First, an announcement that the City backs the cause of the boycotters carries an implicit recommendation that City residents should do likewise. Pronouncements of principle always carry an implicit suggestion that others should act in the way the speaker deems honorable. In fact, such pronouncements more often than not are accompanied by explicit suggestions that the reader or listener act in the manner the speaker proclaims to be proper. There is little or no difference between resolutions carrying an implicit suggestion and those that make the recommendation explicit. Since we have concluded that the former type of resolution is not preempted in this case, neither is the latter.

Second, in urging City residents to honor the boycott, the council is engaging in pure speech. As we have already indicated, a purely hortatory resolution by a City Council cannot be said to curtail or hinder an employer's right freely to use all economic weapons available to it; nor can such a resolution otherwise be said to have a "real effect on federal rights". *Livadas,* 512 U.S. at ——, 114 S.Ct. at 2076. Accordingly we conclude that in urging its constituents to join a lawful boycott, as in announcing its own support for the boycott, the Oakland City Council did not engage in preempted conduct.

## VI. The Oral Resolution

■ We now turn to the second resolution. We must decide whether federal labor law preempts the City from cancelling its subscriptions to the Tribune or from ceasing to advertise in the newspaper. We conclude

that the City's actions reflected in the oral resolution are also not the type of conduct that Congress intended to preempt. The actions do not rise to the level of regulation and are not subject to preemption.

■ Boycotts, like picket lines, have a time-honored place in American history, and the right of workers to engage in primary boycotts and to appeal to consumers for support has been affirmed by the Supreme Court on numerous occasions. *See DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *NLRB v. Servette, Inc.,* 377 U.S. 46, 55–57, 84 S.Ct. 1098, 1104–05, 12 L.Ed.2d 121 (1964); *NLRB v. Fruit & Vegetable Packers,* 377 U.S. 58, 69, 70, 72, 84 S.Ct. 1063, 1069, 1070, 1071, 12 L.Ed.2d 129 (1964). In asking us to hold that federal preemption law prohibits municipalities from choosing to honor a traditional form of "concerted action," [13] such as a boycott or a picket line, ANI is asking us to declare that cities must, notwithstanding their wishes, involuntarily patronize struck or boycotted businesses.

As previously noted, congressional intent is the touchstone of preemption analysis, *Ma-*

*lone,* 435 U.S. at 504, 98 S.Ct. at 1190. We are reluctant to infer a congressional desire to limit the historic freedom of workers to seek support from *all* customers of struck or boycotted companies, and to request *all* those customers *including municipalities* to withhold economic support from such companies during the course of a labor dispute.[14] More particularly, we are not willing to assume that Congress wished to limit the right of states or municipalities to participate in consumer boycotts or intended to compel them to act in a manner that contravenes their civic consciences—at least in cases in which the their action would not have some "real effect" or practical economic impact on the employer that is either different from that of the ordinary customer or is otherwise governmental in nature.[15]

We do not believe that it would be proper for us simply to assume that Congress intended to say to states and cities: You are required to force your officials, employees, and invitees to cross picket lines or enter boycotted premises against their wishes and yours. Yet, the district court's holding, in the name of preemption, requires Oakland to

---

**13.** Strikes, picketing, and boycotts are all forms of "concerted action" protected under § 157 of the Labor–Management Relations Act, 29 U.S.C. § 141 *et seq.* (formerly the National Labor Relations Act).

**14.** In *Hawaii Tribune–Herald, Ltd. v. Kimura,* 272 F.Supp. 175 (D.Haw.1967), the court held that preemption did not prohibit the County of Hawaii from withdrawing its advertisements from the Tribune Herald in order to comply with a state policy to remain neutral in any labor dispute by abstaining from doing business with a firm whose employees are currently on strike. In explaining its decision the court said:

[T]here is nothing in the plaintiff's allegations to indicate that the municipality has not simply attempted to remain neutral and impartial in the labor dispute. There is no allegation that the county made an effort to interfere with the substantive issues which lie between the newspaper and the unions. *Indeed, the counterargument could be made that the county would be favoring the newspaper over the union by retaining its advertising in the Tribune–Herald. Id.* at 178 (emphasis added).

**15.** The district court determined that the City's actions were preempted because the City put its thumb on the scale, impermissibly tilting the

balance in favor of the union. We do not decide whether a City's participation in a boycott might be preempted if its actions served to change the economic balance, because we conclude that there was no showing that the City's actions could have had any significant impact or effect and therefore those actions did not even rise to the level of a thumb on the scale. It could as easily be argued, however, that by requiring the City to continue to patronize the Tribune, the federal courts would be compelling the City to put its thumb on the scale in favor of ANI. See n. 21 *supra.* True neutrality is not possible in face of a strike or boycott. All consumers effectively support one side or the other—no matter what decisions they make or fail to make. Purchasing a boycotted product provides economic support to the manufacturer. Refusing to do so constitutes the withholding of such support and benefits the union. The district court's injunction would require the city to take a position that benefits the employer. Whether or not a municipality may ever be compelled to do so in the name of *Machinists* or *Garmon* preemption is a question that will have to await a case in which the City's withholding or furnishing of economic support would have a "real effect" or significant economic impact upon the parties and thus can be argued to be regulatory. For now, we reserve judgment on that issue.

do just that; for the district court's ruling compels the City to defy the boycott by purchasing boycotted products. Moreover, by compelling the City to place advertising in the Oakland Tribune, the court order requires it to make its advertisements an integral part of the boycotted product. We do not believe that any principle of national labor policy dictates such a result.

We recognize that a more difficult question may exist in a case in which a City is not simply one of a large number of consumers but a significant patron of the boycotted business. In such a case, a City may be exercising the aggregate purchasing power of its citizens—for instance, when the City buys a product to be used on behalf of its citizens that they have no need to buy for themselves—garbage trucks, fire hoses, or a police dispatch system. Then, it might be possible to argue that the City through its power of the purse is able to exercise what is effectively regulatory power. Similarly, it might be argued that the City's conduct is potentially regulatory when the City purchases an unusually large quantity of a given product. In such cases, the City, drawing on its powers to tax and spend, is acting in a manner that a typical consumer cannot; so its conduct might be argued to be both coercive and governmental in nature. Under such circumstances, an argument could be made that federal law may legitimately impose constraints on the City's conduct that may not be imposed on the conduct of private parties. However, that argument is one we need not examine today, and we do not mean to imply any position as to its merits.

In the case before us, the City of Oakland does not wield any economic power over the Tribune—either as a subscriber or as an advertiser. To the contrary, the City is simply a run-of-the-mill, indeed it would appear a wholly insignificant, customer. The City's 13–odd cancelled subscriptions do not even reach the level of a minimal portion of the Tribune's total sales. Indeed, it takes no knowledge of the newspaper business to recognize that those subscriptions constitute a minuscule percentage of the circulation of a daily newspaper in a City the size of Oakland. Thus, the City's decision to cancel its

subscriptions would have no "real effect" or economic impact on the Tribune or on the labor dispute between ANI and the workers. In short, in acting as it did, the City was not wielding an economic weapon or "regulating" the employer, but was rather engaging in a symbolic gesture intended to show its sympathy for the workers' economic circumstances.

Nor is the municipality in its role as an advertiser more than an ordinary customer of the Tribune, if that. There is not a shred of evidence in the record to suggest that the City of Oakland was in any way a substantial or significant advertiser or that its advertising approached in volume that of any of the City's major businesses, such as department stores, theater chains, or automotive dealers. In fact, while the record indicates that the City had placed about $40,000 of advertising a year in the Tribune, the employer does not contend, or offer a whit of evidence, that the City's advertisements constitute more than a minuscule or de minimis portion of the newspaper's total advertising revenue; nor does common sense suggest otherwise. Thus, the City's decision to cease advertising in the Tribune, like its decision to cancel its subscriptions, represents principally a symbolic gesture rather than an economic threat or a regulatory action.

■■■ Our analysis is fully consistent with the Court's holdings on both *Machinists* and *Garmon* preemption. In ruling that Congress intended to permit workers and employers to resort to economic self-help and to permit bargaining to take place in an arena "controlled by the free play of economic forces," *Machinists*, 427 U.S. at 140, 96 S.Ct. at 2553, the Court did not bar local governments from acting in that arena entirely. See *Boston Harbor*, 507 U.S. at 226–28, 113 S.Ct. at 1196. Rather, the Court prohibited local governments from acting "to curtail or entirely prohibit self-help." *Golden State Transit*, 475 U.S. at 615, 106 S.Ct. at 1399. *Golden State* reiterates the fundamental proposition underlying *Machinists* preemption: " '[F]ederal law intended to have the employer and the union free to use their economic weapons against one another' " (quoting *Belknap Inc. v. Hale*, 463 U.S. 491, 500, 103 S.Ct. 3172, 3178, 77 L.Ed.2d 798

(1983)) *Id.* at 619, 106 S.Ct. at 1401. Thus, the state may not interfere with that process.[16]

None of the City's actions at issue here curtails self-help, serves to coerce any party, or may fairly be said to "interfere" with the process. The City did not use its regulatory powers to ban boycotts in general or a boycott of the Tribune in particular. Nor, did the City adopt a resolution supporting *all* economic boycotts or any other general policy that could have a deterrent effect on the future conduct of all employers. *Cf. Chamber of Commerce of United States v. Reich,* 74 F.3d 1322 (D.C.Cir.1996), (discussed at n. 19, *infra.*) Finally, as we have explained earlier, the City did not exert undue economic pressure on a party to a labor dispute. Rather, it simply participated in a particular boycott as an ordinary consumer, in a manner that had at the very most a minuscule effect upon the Tribune.

In engaging in conduct with so limited an impact, the City was acting in a manner wholly consistent with the "free play of economic forces." The City Council's resolutions did not "interfere" with the ordinary course of the collective bargaining process. To the contrary, the City's action is precisely the type of conduct Congress contemplated when it permitted labor unions to use picket lines and boycotts as an economic weapon and to attempt to persuade customers to respect them. The voluntary action of those customers constitutes a part of the free operation of the market forces that Congress wished to preserve. In the absence of some additional factor that would cause us to classify a municipal entity's decision as "regulatory", we do not believe that simply deciding,

as a run-of-the-mill consumer, to respect a picket line or boycott is enough to invoke the doctrine of preemption.

For reasons that are similar in some respects, we conclude that the City did not regulate conduct that was prohibited or protected by the NLRA and thereby violate *Garmon* preemption.[17] The Court has ruled that, under the *Garmon* doctrine, states cannot issue an injunction to prohibit conduct that the NLRA could bar through a cease-and-desist order, *Garmon,* 359 U.S. 236, 79 S.Ct. 773, cannot adjudicate a dispute between a worker and his union just because the dispute is presented as a contract claim rather than as a labor dispute, *Amalgamated Ass'n of Street, Elec. Ry. and Motor Coach Employees v. Lockridge,* 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), and cannot impose a separate penalty on companies that have violated the NLRA, *Wisconsin Department of Industry, Labor and Human Relations v. Gould Inc.,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986).

ANI claims that the written resolution, which criticized ANI for "anti-labor conduct," shows that the City was penalizing ANI for engaging in "unfair labor practices" in violation of § 8(a)(5) of the NLRA. We disagree. We need not consider whether respecting a picket line or a boycott could ever be deemed to be "penalizing" an employer. For "anti-labor conduct" is a much broader and more comprehensive term than the statutory term-of-art "unfair labor practices." Although the City Council explicitly listed its objections to ANI's conduct in its resolution, the council did not accuse ANI of engaging in unfair

---

**16.** *Machinists* preemption has been held to preempt a range of governmental conduct that interferes with the ordinary free play of the market and rises to the level of a regulatory act. Under that doctrine, the Court has prohibited states from awarding punitive damages for business losses resulting from a secondary boycott, *Local 20, Teamsters, Etc., Union v. Morton,* 377 U.S. 252, 260, 84 S.Ct. 1253, 1258–59, 12 L.Ed.2d 280 (1964), prohibited the NLRB from barring an on-the-job "slow-down" or "sit-in," *N.L.R.B. v. Insurance Agents' International Union,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), and prohibited a City from conditioning a taxi company's franchise renewal on the employer's settlement of a labor dispute with its work-

ers, *Golden State Transit v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). The Court has also prohibited states from restricting picketing permitted under federal law, *Garner v. Teamsters, Chauffeurs and Helpers Local Union,* 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953), enjoining employees from refusing to work overtime, *Machinists,* 427 U.S. 132, 96 S.Ct. 2548 (1976), and outlawing strikes or lockouts, *id.* at 147, 96 S.Ct. at 2556–57.

**17.** The district judge did not find that the City's actions were preempted under *Garmon* although he suggested that they might be.

labor practices. Moreover, ANI did not present evidence suggesting that the council members adopted the written resolution, or the accompanying voice resolution, because they believed that ANI had engaged in unfair labor practices. To the contrary, the evidence submitted by ANI showed that the Council's objections were to the company's overall corporate philosophy and to what its members perceived to be its hostile and uncaring attitude toward its employees. The evidence suggests only that the Council strongly disapproved of ANI's conduct—not that it thought it violated federal law.[18]

ANI also argues that the City was unlawfully trying to pressure the newspaper to reach an agreement with its workers, even though § 8(d) of the NLRA protects a company's right *not* to reach an agreement, provided the company bargains in good faith. That argument is merely a recycled version of the *Machinists* preemption argument we have previously rejected. Saying that the City tried to pressure ANI to reach an agreement is no different than saying that the City tried to regulate that which under *Machinists* is meant to be free from regulation—the economic combat between the union and management, as each tries to force the other to come to terms. ANI is asking us to conclude that federal law preempts a municipality from showing its moral support for workers by expressive or symbolic conduct, in short from engaging in conduct that does not rise to the level of being "regulatory,"—conduct that has no "real effect." *Livadas.* 512 U.S. at ——, 114 S.Ct. at 2076. *Garmon* preemption cannot be stretched so far.

Our conclusion that the City's resolutions are not preempted under either *Machinists* or *Garmon* because they are not regulatory in nature is not a novel one. The Second Circuit, confronted with an issue similar to the one before us, also concluded that actions without a real or practical impact on the parties involved in the labor controversy are not preempted. That circuit held that a City

policy (adopted by way of resolution) permitting only union printers to bid on "flat-form printing business" was not preempted because nothing in the record "indicates that the City's flat-form printing needs, as distinguished from either the City's overall printing needs or the total printing work available in and around New York City, are substantial enough to have even an indirect *coercive effect* on nonunion employees to abandon their Section 7 right not to join a union." *Image Carrier Corp. v. Beame,* 567 F.2d 1197, 1202 (2d Cir.1977) (emphasis added); *see also Fisher Scientific Co. v. City of New York,* 812 F.Supp. 22, 27 (S.D.N.Y.1993) (refusing to enjoin a proposed boycott resolution and holding that only *coercive* City action is subject to preemption). Unlike the resolution at issue here, the New York City resolution in *Image Carrier* covered all the City's flat-form printing business.[19] Obviously Oakland's resolution had far less impact than New York's, and fell even shorter of constituting a regulation.

In *Chamber of Commerce of United States v. Reich,* 74 F.3d 1322 (D.C.Cir.1996), the District of Columbia Circuit held that a presidential executive order prohibiting the federal government from contracting with employers who hire permanent replacements during a lawful strike was preempted under *Machinists* and *Garmon.* *Id.* at 1338. Without endorsing that decision, we note that it is fully consistent with our holding here. First, the executive order at issue in *Reich* involved adoption by government of a *general regulatory provision* governing its dealings with all private bidders. The regulation operated prospectively to deter anti-labor conduct and thus to shift the balance of power toward workers and retrospectively to punish transgressors. Oakland, by contrast, chose to support workers in one particular boycott, a boycott involving a major employer of City residents. Second, in reaching its decision the District of Columbia Circuit emphasized the unparalleled economic clout of

---

**18.** *See infra* note 22.

**19.** Because it is not necessary to express an opinion on the issue whether a city may generally limit bids on city contracts to union shops, any

such decision on our part must await an appropriate case in this circuit. We rely on *Image Carrier* only for the general principle it establishes as to the necessity of a "coercive effect".

the federal government, citing statistics showing that federal government purchases totaled 6.5% of the gross domestic product in 1994 and that federal contractors and subcontractors employ 26 million workers, or 2% of the nation's labor force. It noted that the executive order had a "substantial impact on American corporations." *Id.* at 1338. There is no evidence in the record before us, however, to indicate that the City of Oakland's actions had a "substantial impact" or indeed anything other than a de minimis impact on ANI.

ANI contends that the outcome here is controlled by *Golden State Transit*, a case in which the Supreme Court held that the City of Los Angeles was barred by preemption from refusing to renew a taxi company's license or franchise unless the company reached an accord with its striking workers. ANI's reliance on *Golden State Transit* is misplaced. That case is not inconsistent with our holding that cities and states are not preempted from engaging in expressive or symbolic actions that have less than a "real or practical" effect on the parties. In *Golden State Transit,* the Court said, "[T]he question is *not* whether the City's action favors one side or the other." 475 U.S. at 619, 106 S.Ct. at 1401 (emphasis added). Rather, the Court held that the City could not wield its regulatory power "in a way that intrudes in the collective-bargaining process." *Id.* The intrusion in *Golden State Transit* stemmed from the fact that the City held life or death power over the taxi company by virtue of its authority to renew or refuse to renew the company's franchise. When the City invoked that power by refusing to renew the franchise because Golden State had failed to sign a collective bargaining agreement, the City effectively coerced the company, and intruded significantly into the collective bargaining process. As the Court said, the Los Angeles City Council's coercive action "destroyed the balance of power designed by Congress, and frustrated Congress' decision to leave open

the use of economic weapons." *Id.* Oakland wielded no such power here.[20]

Although the Supreme Court has suggested in dicta that participation in a boycott could constitute regulatory action and thus preempted activity, *Boston Harbor,* 507 U.S. at 228–30, 113 S.Ct. at 1197; *see also Gould,* 475 U.S. at 290, 106 S.Ct. at 1063, neither the Supreme Court nor any other federal court has ever held, prior to this case, that federal preemption law prohibits local governments from participating in a boycott. In *Boston Harbor,* the Court held that a state agency could lawfully require contractors on a massive state construction project to hire only union employees in order to help ensure that the $6 billion project would be completed on schedule; in *Gould,* the Court held that Wisconsin could *not* prohibit companies that had been repeatedly cited for violating the NLRA from bidding on state contracts. In neither case was a boycott at issue. We do not believe that either the language or spirit of *Boston Harbor* or *Gould* supports the conclusion that the City of Oakland's actions here are preempted. Nor do we believe that Congress intended to preempt expressive resolutions such as the first resolution the City enacted or symbolic actions without "real" effect such as those encompassed in the City's second resolution. Accordingly, we reject ANI's preemption arguments.

## VII. ANI's First Amendment Rights

■■■ Because the district court concluded that the City's actions were preempted, it declined to decide whether those actions violated ANI's First Amendment rights. Since we may affirm a grant of summary judgment on any ground adequately supported in the record, *USA Petroleum Co. v. Atlantic Richfield Co.,* 13 F.3d 1276, 1279 (9th Cir.1994), we turn to the merits of ANI's First Amendment claim, as the company urges us to do.

---

**20.** In *Golden State Transit,* the Court held that the City's action was preempted under *Machinists.* The Court did not decide whether it was also preempted under *Garmon,* because the taxi company and amici relied "exclusively on the *Machinists* doctrine" and the Court found "their argument persuasive." 475 U.S. at 614 n. 4, 106 S.Ct. at 1398 n. 4. Even assuming that the City's action in *Golden State Transit* was barred by *Garmon* preemption, as well as by *Machinists'*, *Golden State Transit* is of no avail to ANI. The case would still stand only for the proposition that municipal action with a highly coercive effect is preempted.

■ ANI contends that the City of Oakland's actions were motivated in substantial part in "retaliation for the collective bargaining and political views held by the ANI and the expression of those views in the Oakland Tribune."[21] In doing so, ANI argues, the City violated the newspaper's First Amendment rights.

Some courts have held that the First Amendment prohibits a state actor from withdrawing its legal advertisements in order to punish a newspaper for its news coverage of a state agency or the views expressed about the agency in its editorial pages. *See North Mississippi Communications, Inc. v. Jones,* 792 F.2d 1330, 1336–37 (5th Cir.1986), *cert. denied,* 506 U.S. 863, 113 S.Ct. 184, 121 L.Ed.2d 129 (1992) (holding that "[a]lthough the Times may have had no 'right' to receive certain legal advertisements from the County Board of Supervisors, it would violate the Constitution for the Board to withhold public patronage, in the form of its advertising, from the Times in retaliation for that newspapers exercise of its first amendment rights . . . by publishing editorials and news stories critical of the Board and its members"); *Review Publications, Inc. v. Navarro,* 19 Media L. Rep. 1337 (S.D.Fla.1991) (affirming award of attorney's fees to newspaper plaintiff after the newspaper had shown that the local sheriff had violated the First Amendment by cancelling legal advertising in the paper in retaliation for the paper's reporting regarding the sheriff); *see also Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (concluding that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests, especially his interest in freedom of speech").

The issue of the constitutionality of withholding public advertising from a newspaper because of its published views is not properly before us, however. ANI has not offered evidence sufficient to raise a genuine issue of disputed fact as to whether members of the City Council were motivated by the newspaper's publication of any articles or editorials relating to the City government or indeed regarding any other subject. To the contrary, it is abundantly clear from the record that the City council members were responding to ANI's treatment of its workers and what they perceived to be its callous corporate policies generally.[22]

■ To the extent that ANI is asserting that its First Amendment rights were violated because the City's actions were motivated by the council's opposition to ANI's labor or corporate policies, ANI has not stated a valid cause of action. The First Amendment protects newspapers from retaliation by government agencies on account of articles or views that the newspapers have published (or intend to publish), not against retaliation because of the internal policies or business conduct of their owners. Accordingly, we decline to affirm the order of summary judgment on First Amendment grounds. Instead, we reverse the judgment.

## VIII. Injunction

Because we hold that the actions of the City at issue here are not regulatory and therefore not preempted, we vacate the injunction issued by the district court. Accordingly, we need not decide (1) whether the Norris–LaGuardia Act would bar an injunc-

**21.** The quoted language comes from ANI's brief. The complaint merely states that the City deprived ANI of "its rights, privileges, and immunities secured by the First and Fourteenth Amendment of the United States Constitution."

**22.** ANI submitted a declaration from its publisher Roger Grossman in support of its summary judgment motion. In that declaration Grossman described the comments that several council members made about the Tribune and Dean Singleton, head of ANI's parent company, during the course of the meeting at which the resolutions were passed. "It is my recollection," Grossman declared, "that Council Member Miley stated that Dean Singleton and his company represented everything that has gone wrong with America. Council Member Miley stated that Singleton was all about leverage buyouts, putting working people out of work, hurting working people, using other people's money, and keeping people down." Grossman also declared: "It is my further recollection that Council Member Jordan indicated that the *Oakland Tribune*'s labor-related actions were an offense against all newspaper employees and added that the *Oakland Tribune*'s actions were indefensible."

tion in this case [23] or (2) whether preemption principles permit courts to issue injunctions that would otherwise be prohibited by the Norris–LaGuardia Act.

## IX. Conclusion

The City's actions are not regulatory and thus not subject to preemption. Accordingly, we reverse the grant of summary judgment and dissolve the injunction.

REVERSED and REMANDED.

**23.** Section four of the Act provides in pertinent part that:

> No court of the United States shall have jurisdiction to issue any restraining order or ... injunction in any case involving or growing out of a labor dispute to prohibit any person or persons *participating or interested in* such dispute from ...

29 U.S.C. § 104 (West 1973) (emphasis added). Section thirteen of the Act defines who is protected from injunctive relief under section four:

> A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, *and* if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or *indirect interest* therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

29 U.S.C. § 113(b) (West 1973) (emphasis added).