364 F.3d 1154
 CHAMBER OF COMMERCE OF the UNITED STATES; California Chamber of Commerce; Employers Group; California Healthcare Association; California Manufacturers and Technology Association; California Association of Health Facilities; California Association of Home & Services for the Aging; Bettec Corporation; Marksherm Corporation; Zilaco Inc., Zilaco; Del Rio Healthcare, Inc.; Beverly Health & Rehabilitation Services, Inc. dba Beverly Manor Costa Mesa; Internext Group, Plaintiffs-Appellees,
American Federation of Labor and Congress of Industrial Organizations, Plaintiff-Appellant,
AFL-CIO & Wholesale Delivery Drivers; California Labor Federation, AFL-CIO, Intervenors-Appellants,
v.
Bill LOCKYER, Attorney General, in his capacity as Attorney General of the State of California; Department of Health Services; Frank G. Vanacore, as the Chief of the Audit Review and Analysis Section of the California Department of Health Services; Diana M. Bonta, Diana M. Bonta, R.N., Dr., P.h.D, as the Director of the California Department of Health Services, Defendants.
Chamber of Commerce of the United States; California Chamber of Commerce; Employers Group; California Healthcare Association; California Manufacturers and Technology Association; California Association of Health Facilities; California Association of Home & Services for the Aging; Bettec Corporation; Marksherm Corporation; Zilaco Inc., Zilaco; Del Rio Healthcare, Inc.; Beverly Health & Rehabilitation Services, Inc. dba Beverly Manor Costa Mesa; Internext Group, Plaintiffs-Appellees, and
AFL-CIO & Wholesale Delivery Drivers; California Labor Federation, AFL-CIO, Intervenors,
v.
Bill Lockyer, Attorney General, in his capacity as Attorney General of the State of California; Department of Health Services; Frank G. Vanacore, as the Chief of the Audit Review and Analysis Section of the California Department of Health Services; Diana M. Bonta, Diana M. Bonta, R.N., Dr., P.h.D, as the Director of the California Department of Health Services, Defendants-Appellants.
 No. 03-55166.
 No. 03-55169.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted September 12, 2003.
 Filed April 20, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Suzanne M. Ambrose, Deputy Attorney General, Sacramento, CA, for the defendants-appellants.
 Scott A. Kronland, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, CA, and Jonathan P. Hiatt, Washington, D.C., for the intervenors-appellants.
 Bradley W. Kampas, Jackson Lewis LLP, San Francisco, CA, Mark E. Reagan, Hooper, Lundy & Bookman, Inc., San Francisco, CA, and Stephen A. Bokat, National Chamber Litigation Center, Inc., Washington, D.C., for the plaintiffs-appellees.
 Daniel V. Yager, McGuiness Norris & Williams, LLP, Washington, D.C., for the amicus curiae LPA, Inc., and Maurice Baskin, Washington, D.C., for the amicus curiae Associated Builders and Contractors, Inc.
 John H. Ferguson, Associate General Counsel, National Labor Relations Board Division of Enforcement Litigation, Washington, D.C., for the amicus curiae National Labor Relations Board.
 Appeal from the United States District Court for the Central District of California Gary L. Taylor, District Judge, Presiding. D.C. No. CV-02-00377-GLT.
 Before: BEEZER and FISHER, Circuit Judges, and ENGLAND, JR., District Judge.*
 FISHER, Circuit Judge:
 
 
 1
 This case presents a convergence of two important governmental interests: the ability of states to control the uses of state funds and the federal government's national labor policy, expressed through the National Labor Relations Act ("NLRA"). The question is whether these two interests conflict here, such that the NLRA overrides California's interest. Specifically, a California statute forbids employers who receive state grants or funds in excess of $10,000 from using such funding to advocate against or in favor of union organizing. We are constrained to conclude that California — acting as a regulator, not a proprietor in imposing these restrictions — has acted in such a way as to undermine federal labor policy by altering Congress' design for the collective bargaining process. Therefore, we hold that the California statute as written is preempted by the NLRA under Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) ("Machinists").
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 On September 28, 2000, California enacted Assembly Bill No. 1889, Cal. Gov't Code §§ 16645-49.[1] The preamble of the statute declares:
 
 
 3
 It is the policy of the state not to interfere with an employee's choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing. It is the intent of the Legislature in enacting this act to prohibit an employer from using state funds and facilities for the purpose of influencing employees to support or oppose unionization and to prohibit an employer from seeking to influence employees to support or oppose unionization while those employees are performing work on a state contract.
 
 
 4
 § 16645, Historical and Statutory Notes, Section 1 of Stats.2000, c. 872.
 
 
 5
 Two provisions of the California statute are at issue on this appeal — sections 16645.2 and 16645.7. Section 16645.2(a) bars private employers who are "recipient[s] of a grant of state funds" from "us[ing] the funds to assist, promote, or deter union organizing." Section 16645.7(a) bars "[a] private employer receiving state funds in excess of [$10,000] in any calendar year on account of its participation in a state program" from using such funds "to assist, promote, or deter union organizing."
 
 
 6
 The phrase "assist, promote, or deter union organizing" includes "any attempt by an employer to influence the decision of its employees in this state or those of its subcontractors regarding... [w]hether to support or oppose a labor organization that represents or seeks to represent those employees .... [or][w]hether to become a member of any labor organization." § 16645(a)(1)-(2). The statute specifies as prohibited "any expense, including legal and consulting fees and salaries of supervisors and employees, incurred for research for, or preparation, planning, or coordination of, or carrying out, an activity to assist, promote, or deter union organizing." § 16646(a). Expressly exempted from the statute's reach are "activit[ies] performed" or "expense[s] incurred" in connection with, inter alia, "[a]ddressing a grievance or negotiating or administering a collective bargaining agreement" and "[n]egotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization." § 16647(a), (d).
 
 
 7
 The statute requires employers covered by sections 16645.2 or 16645.7 to certify that no state funds will be used to assist, promote or deter union organizing. §§ 16645.2(c), 16645.7(b). The statute also requires employers who make expenditures to assist, promote or deter union organizing to maintain and provide upon request "records sufficient to show that state funds have not been used for those expenditures." §§ 16645.2(c), 16645.7(c).[2] If an employer commingles state and other funds, the statute presumes that any expenditures to assist, promote or deter union organizing derive in part from state funds. § 16646(b).
 
 
 8
 Employers who violate sections 16645.2 or 16645.7 are subject to fines and penalties, which include the return of the state funds used for the prohibited purposes and a civil penalty equal to twice the amount of those funds. §§ 16645.2(d), 16645.7(d). Suspected violators may be sued by the State Attorney General or any private taxpayer. § 16645.8(a)-(c). Prevailing plaintiffs, and prevailing taxpayer intervenors who make substantial contributions, are "entitled to recover reasonable attorney's fees and costs." § 16645.8(d).
 
 
 9
 In April 2002, plaintiffs-appellees (collectively the "Chamber of Commerce") brought an action for injunctive and declaratory relief challenging the statute on numerous grounds, including NLRA preemption. The AFL-CIO and others (collectively the "AFL-CIO") intervened. In May 2002, the Chamber of Commerce moved for summary judgment. Defendants, who are the California Department of Health Services and state officials sued in their official capacity (collectively "California"), filed motions for summary judgment in August 2002.
 
 
 10
 On September 16, 2002, the district court granted partial summary judgment in favor of the Chamber of Commerce, holding that the NLRA preempts sections 16645.2 and 16645.7 under the Supreme Court's Machinists decision, because they "regulate[] employer speech about union organizing under specified circumstances, even though Congress intended free debate." The district court entered judgment in January 2003. It also issued an injunction prohibiting California and the AFL-CIO from taking any actions to enforce sections 16645.2 and 16645.7 against any employer covered by the NLRA.
 
 
 STANDARD OF REVIEW
 
 
 11
 We review de novo both a district court's grant of summary judgment, Winterrowd v. American General Annuity Ins. Co., 321 F.3d 933, 937 (9th Cir.2003), and its preemption analysis, Ting v. AT & T, 319 F.3d 1126, 1135 (9th Cir.2003).
 
 
 DISCUSSION
 
 
 12
 I. The Market Participant Exception to NLRA Preemption
 
 
 13
 Before addressing the merits of the preemption issue, we first must decide whether California's conditioning the use of its funds constitutes "regulation." "A prerequisite to preemption [under the NLRA] is a finding that the state or local action in question constitutes regulation of labor relations between employers and employees." Alameda Newspapers, Inc. v. City of Oakland, 95 F.3d 1406, 1413 (9th Cir.1996). The NLRA "does not preempt actions taken by a state when it ... acts as a mere proprietor or market participant." Dillingham Constr. N.A., Inc. v. County of Sonoma, 190 F.3d 1034, 1037 (9th Cir.1999) (citing Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc., 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) ("Boston Harbor ")). We conclude that California has acted as a regulator in enacting §§ 16645.2 and 16645.7, and that the market participant exception does not apply.
 
 
 14
 Two Supreme Court cases define the scope of the market participant exception: Wisconsin Department of Industry v. Gould Inc., 475 U.S. 282, 287, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), and Boston Harbor, 507 U.S. at 218, 113 S.Ct. 1190.[3] In Gould, the Court addressed a Wisconsin statute that forbade state procurement agents from using state funds to purchase products manufactured or sold by "labor law violators," employers who had violated the NLRA three times within a five year period. 475 U.S. at 283-84, 106 S.Ct. 1057. Wisconsin conceded that it did not have the power to bar its residents from doing business with repeat violators of the NLRA. Id. at 287, 106 S.Ct. 1057. It argued, however, that its statutory scheme was not unlawful because the statute merely regulated the spending power of its procurement officers. Id. The Court found this to be a "distinction without a difference" because the Wisconsin statute "serve[d] plainly as a means of enforcing the NLRA. [Wisconsin] concede[d], as we think it must, that the point of [its] statute is to deter labor law violations and to reward fidelity to the law." Id. (internal quotation marks omitted). The Court emphasized the "rigid and undiscriminating manner" in which the statute operated, and held that"[n]o other purpose" could be ascribed to the statute than creating an additional remedy for violations of the NLRA. Id. at 287-88, 106 S.Ct. 1057.
 
 
 15
 In Boston Harbor, on the other hand, the Court held that the Massachusetts Water Resources Authority, a state agency, acted as a market participant when it required contractors working on the clean-up of Boston Harbor to agree to the terms of a project labor agreement negotiated by a project construction manager and a labor union. The Court concluded that there was "no question but that [the state agency] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." 507 U.S. at 232, 113 S.Ct. 1190. The Court also noted that "the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project," and that there was no reason to believe that the government was motivated by anything but purely proprietary interests. Id.
 
 
 16
 We have applied these cases in a number of contexts, without formulating a general rule for applying the market participant exception. We held that the market participant exception did not apply to a California law that permitted employees in state-approved apprenticeship programs to receive less than the prevailing wage but required employees in non-approved apprenticeship programs to receive the prevailing wage. See Dillingham, 190 F.3d at 1037-38 (noting that the apprenticeship standards were not "based upon unique needs that the ... project presented" and that the state was not motivated by "management concerns" in implementing the standards). On the other hand, we applied the exception and held that the City of Oakland was a market participant when it canceled a newspaper subscription and refused to continue to pay for advertising during a labor dispute. Alameda Newspapers, Inc. v. City of Oakland, 95 F.3d 1406, 1415-16 (9th Cir.1996). We have also held that a city may require private contractors to adhere to the terms of a collective bargaining agreement when doing business with the city. Assoc. Builders & Contractors, Inc. v. City of Seward, 966 F.2d 492, 496 (9th Cir.1992).[4]
 
 
 17
 The combined teaching of these cases is that when a state uses its spending power to shape the overall labor market in a manner that is essentially nonproprietary, the market participant exception will not apply and the state action may be subject to NLRA preemption. We draw upon the reasoning of the Fifth Circuit, which uses a two-part test as an aid in determining when the market participant exception applies:
 
 
 18
 First, does the challenged action essentially reflect the entity's own interest in the efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem? Both questions seek to isolate a class of government interactions with the market that are so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out.
 
 
 19
 Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 693 (5th Cir.1999).
 
 
 20
 The first prong, which looks to the nature of the expenditure, protects comprehensive state policies with wide application from preemption, as long as the type of state action is essentially proprietary. See Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh, 295 F.3d 28, 34-36 (D.C.Cir.2002) (holding an executive order that applied to all federally funded construction projects not preempted, where the order concerned a project labor agreement that private employers often enter into in the construction field). The second prong, which looks at the scope of the expenditure, protects narrow spending decisions — decisions that do not necessarily reflect a state's interest in the efficient procurement of goods or services but that also do not have the effect of broader social regulation. See, e.g., Alameda Newspapers, 95 F.3d at 1417-18. Both prongs are methods of determining whether the state action at issue in fact constitutes regulation.
 
 
 21
 Here, we conclude that sections 16645.2 and 16645.7 are regulatory and thus not covered by the market participant exception. Turning to the first prong, the statute on its face does not purport to reflect California's interest in the efficient procurement of goods and services, as measured by the similar behavior of private parties. Rather, the statute's preamble makes clear that the legislative purpose is not procurement, but preventing the state from influencing employee choice about whether to join a union. § 16645, Historical and Statutory Notes, Section 1 of Stats.2000, c. 872 ("It is the policy of the state not to interfere with an employee's choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing.") (emphasis added).
 
 
 22
 Nor do sections 16645.2 and 16645.7 have a narrow scope or any other element that would indicate that the statute is unrelated to broader social regulation. To the contrary, the statute by its design sweeps broadly to shape policy in the overall labor market. The statute applies to all employers in California who accept any state grant or funding in excess of $10,000. §§ 16645.2, 16645.7. It imposes separate accounting requirements on any business that accepts a state grant or enters into a contract with the state for more than $10,000. Id. It contains a provision for civil penalties and permits private parties to file civil actions against employers who violate the statute. §§ 16645.2(d), 16645.8. The statute's scope indicates a general state position, not a narrow attempt to achieve a specific goal. Thus, there is no question but that sections 16645.2 and 16645.7 are designed to have a broad social impact, by altering the ability of a wide range of recipients of state money to advocate about union issues.[5] Therefore, we conclude that sections 16645.2 and 16645.7 are regulatory measures that do not fall within the market participant exception.
 
 II. NLRA Preemption
 
 23
 That sections 16645.2 and 16645.7 are regulatory measures does not mean that they are automatically preempted by the NLRA. "We are reluctant to infer preemption," Boston Harbor, 507 U.S. at 224, 113 S.Ct. 1190, and any analysis of preemption begins with the "basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Preemption is a question of congressional intent, and the "purpose of Congress is the ultimate touchstone of pre-emption analysis." Alameda Newspapers, 95 F.3d at 1413 (quoting Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) (internal quotation marks omitted)). Although the NLRA contains no express preemption provision, the Supreme Court has articulated two distinct NLRA preemption principles: Garmon preemption, set forth in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), which prohibits states from regulating in the zone reserved for NLRB jurisdiction, and Machinists preemption, set forth in Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). See Boston Harbor, 507 U.S. at 224-26, 113 S.Ct. 1190. We hold that sections 16645.2 and 16645.7 are pre-empted under Machinists, and therefore do not reach the question of Garmon preemption.
 
 
 24
 Machinists preemption is based on the premise that by regulating certain parts of the collective bargaining process, Congress intended other parts to be free from state regulation and left "to be controlled by the free play of economic forces." Machinists, 427 U.S. at 140, 96 S.Ct. 2548 (internal quotation marks omitted). The doctrine "is based on the premise that `the use of economic pressure by the parties to a labor dispute is ... part and parcel of the process of collective bargaining,'" which means that "neither a state nor the [NLRB] is `afforded flexibility in picking and choosing which economic devices of labor and management shall be branded unlawful.'" Alameda Newspapers, 95 F.3d at 1413 (quoting Machinists, 427 U.S. at 144, 149, 96 S.Ct. 2548). "Machinists pre-emption preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190 (internal quotation marks omitted).
 
 
 25
 California and the AFL-CIO argue that Congress did not intend the NLRA to limit a state's ability to control its own funds. Conditions on the use of state funds are, they say, categorically different from more direct restrictions on the labor organizing process. Because sections 16645.2 and 16645.7 allow parties an unfettered ability to use non-state funds to advocate for or against union organization, California and the AFL-CIO claim that the statute merely affects California's use of its own funds and does not impermissibly regulate in any area the NLRA intended to be regulation-free.
 
 
 26
 This argument has some force. Congress has offered no explicit guidance in this area, either in the NLRA itself, or in the legislative history of the Act. See Garner v. Teamsters, Chauffeurs and Helpers Local Union, 346 U.S. 485, 488, 74 S.Ct. 161, 98 L.Ed. 228 (1953) ("The [N]ational Labor Management Relations Act ... leaves much to the states, though Congress has refrained from telling us how much."). Moreover, the emphasis of Machinists preemption on "restrictions on economic weapons of selfhelp," Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 614, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986), poses a particular difficulty in the context of state restrictions on the use of a state's own funds, because when a state imposes such conditions it is arguably not restricting self-help by private parties but merely the degree to which state money is used to fund such self-help. Because the California statute regulates no more than the uses to which California's own funds are put, rather than imposing a collateral penalty on additional private behavior not funded by the state, the Supreme Court cases that have found state exercises of the spending power preempted by the NLRA are not directly controlling. See Gould, 475 U.S. at 287-89, 106 S.Ct. 1057 (state denying procurement business to private employers who were repeat labor law violators); Golden State, 475 U.S. at 615, 618, 106 S.Ct. 1395 (city conditioning renewal of a taxi company's franchise on settlement of a labor dispute).
 
 
 27
 Nonetheless, we conclude that the NLRA preempts the California statute. Although the Machinists doctrine does not normally prevent neutral state regulation of the labor market, it does prevent state law that both explicitly targets and directly regulates processes controlled by the NLRA. Because the California statute, on its face, directly regulates the union organizing process itself and imposes substantial compliance costs and litigation risk on employers who participate in that process, it interferes with an area Congress intended to leave free of state regulation. It is therefore preempted under Machinists.
 
 
 28
 A. Machinists and Advocacy for or Against Union Organizing
 
 
 29
 As explained above, the theory of Machinists preemption is that by establishing certain parameters for the union organizing process in the NLRA, Congress intended to leave other aspects of the bargaining process to the "free play of economic forces" and otherwise unregulated by the states. Machinists, 427 U.S. at 140, 96 S.Ct. 2548 (noting that the "crucial inquiry" is whether "Congress intended that the conduct involved be unregulated because left to be controlled by the free play of economic forces") (internal quotation marks omitted). The ability of labor and management to advocate for or against unionization is one such aspect of the collective bargaining process. 29 U.S.C. § 158(c) (NLRA § 8(c)) provides that:
 
 
 30
 The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.
 
 
 31
 An extensive jurisprudence has developed around Congress' balancing of speech interests in the context of labor organizing, a jurisprudence emphasizing that open and robust advocacy by both employers and employees must exist in order for the NLRA collective bargaining process to succeed. See Steam Press Holdings, Inc. v. Hawaii Teamsters & Allied Workers Union, 302 F.3d 998, 1009 (9th Cir.2002) ("Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in uninhibited, robust, and wide-open debate.") (internal quotation marks omitted). We note further that where the NLRA has sought to put limits on advocacy for or against union organization, it has expressly set forth the mechanisms for doing so. Sections 8(a) and 8(b) of the Act set out a series of restrictions in the form of unfair labor practices on the ability of employees and unions to achieve their goals, whereas section 8(c) expressly exempts the general expression of views on union organization from these restrictions. See, e.g., 29 U.S.C. § 158(b)(7) (NLRA § 8(b)(7)) (prohibiting, in certain circumstances, picketing by a labor union where the union is not certified as the representatives of the employee).
 
 
 32
 To be sure, the states are not forbidden from any and all regulation of employer and union speech during the collective bargaining process. See, e.g., Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 61, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (upholding state jurisdiction over defamation suits in the context of union organizing, but limiting such jurisdiction to defamation made with actual knowledge of falsity or reckless disregard for the truth). But an overriding principle of the NLRA is that the collective bargaining process cannot function unless both employers and employees have the ability to engage in open and robust debate concerning unionization.[6] See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893 (1937) ("The theory of the Act is that free opportunity for negotiation ... may bring about the adjustments and agreements which the Act in itself does not attempt to compel."). The NLRA's declared purpose is to "restor[e] equality of bargaining power" by, among other ways, "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." 29 U.S.C. § 151 (NLRA § 1).
 
 
 33
 Therefore, by addressing employer actions that assist, promote or deter union organizing, California's statute targets a process necessary to the functioning of the overall process established by the NLRA. As one influential authority puts it:
 
 
 34
 Providing a legal framework for self-organization and collective bargaining involves determining not only how far the conduct of employers and unions should be regulated but also how far they should be free. In revising the employer unfair labor practice provisions of the Wagner Act in 1947, Congress necessarily decided not only what coercive tactics should be forbidden, but also what methods of persuasion should be permitted employers seeking to induce their employees not to join labor unions.
 
 
 35
 Archibald Cox, Labor Law Preemption Revisited, 85 HARV. L. REV. 1337, 1352 (1972) (cited with approval in Machinists, 427 U.S. at 140 n. 4, 96 S.Ct. 2548).
 
 B. Direct State Interference
 
 36
 To violate Machinists, however, the state regulation at issue must do more than incidentally affect the union organizing process. The Supreme Court has consistently distinguished between state laws of general applicability (such as regulation of labor conditions), which generally are not preempted by the NLRA, and state regulation of the NLRA process itself, which generally is preempted. See Machinists, 427 U.S. at 156, 96 S.Ct. 2548 (Powell, J., concurring) ("[The Machinists doctrine] does not ... preclude the States from enforcing, in the context of a labor dispute, `neutral' state statutes or rules of decision: state laws that are not directed toward altering the bargaining positions of employers or unions but which may have an indirect effect on relative bargaining strength."). For example, state regulation of minimum labor conditions is generally not preempted. See Metropolitan Life, 471 U.S. at 753, 105 S.Ct. 2380 (holding that the NLRA is not particularly concerned with, and is not intended to affect, the "substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions"); Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 20-21, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (holding that because "[b]oth employers and employees come to the bargaining table with rights under state law that form a backdrop for their negotiations," the NLRA does not preempt substantive minimum labor standards, although it does preempt direct state interference with the NLRA's "equitable bargaining process") (internal quotation marks omitted). Nor will the NLRA normally preempt ordinary state contract law of general applicability. See Belknap, Inc. v. Hale, 463 U.S. 491, 500, 103 S.Ct. 3172, 77 L.Ed.2d 798 (holding that the NLRA does not preempt state law contract actions by replacement workers to enforce terms of an employment contract).[7]
 
 
 37
 The situation is different, however, when the state regulation directly targets a process that is central to the union organizing and collective bargaining system established by the NLRA. This is true regardless of whether the direct state regulation is designed to benefit employers, employees or even the public at large. As Justice Powell noted, "State laws should not be regarded as neutral if they reflect an accommodation of the special interests of employers, unions, or the public in areas such as employee self-organization, labor disputes, or collective bargaining." Machinists, 427 U.S. at 156 n. *, 96 S.Ct. 2548 (Powell, J., concurring).
 
 
 38
 Moreover, for the purposes of this analysis, we are concerned with the state statute's function, not its form. We are to focus on "the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted." Golden State, 475 U.S. at 614 n. 5, 106 S.Ct. 1395 (internal quotation marks omitted); see also Gould, 475 U.S. at 289, 106 S.Ct. 1057 ("It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern."). In Golden State, the Court explicitly rejected the argument that state regulation was immune from Machinists preemption because the regulation took the form of a traditional use of local authority to grant a benefit, and preempted an exercise of a city's decision to grant a taxi franchise. 475 U.S. at 615, 618, 106 S.Ct. 1395. Although a state's ability to control the use of its funds is an important state interest, regulation that specifically targets and substantially affects the NLRA bargaining process will be preempted, even if such regulation comes in the form of a restriction on the use of state funds.
 
 C. The California Statute
 
 39
 To summarize, state regulation is preempted when it directly targets and substantially affects open employer discussion about unionization, even if such regulation comes in the form of a restriction on the use of state funds. The focus of our preemption analysis is on whether the state statute directly interferes with federal labor policy, not the state statute's formal nature. See Gould, 475 U.S. at 289, 106 S.Ct. 1057. Under these principles, the California statute is clearly preempted, even though it restricts only the use of California's own funds.
 
 
 40
 The statute has both the explicit purpose and the substantive effect of interfering with the NLRA system for organizing labor unions. By explicitly targeting activity designed to "assist, promote, or deter union organizing" the statute is on its face designed to interfere directly with the NLRA's own system for the promotion or deterrence of union organizing by employers and employees. The statute will alter the NLRA process of collective bargaining and union organizing, because an employer who decides against neutrality will incur both compliance costs and litigation risk. Employers are required to maintain separate accounts for state funds and non-state funds (if they wish to use any private funds for speech on union organization), and they must make those records available to the state's attorney general upon request. § 16645.2(c). If an employer fails to keep such records, any funds spent on assisting, promoting or deterring union organization will be allocated "between state funds and other funds on a pro rata basis," which means that an employer who fails to segregate funds and then spends any money assisting, promoting or deterring union organizing is automatically subject to the statute's remedial provisions. § 16646(b); see §§ 16645.2(d), 16645.7(d).
 
 
 41
 Crucially, the statute contains not only a provision for compensatory damages to the state and injunctive and equitable relief, but also makes employers who violate the statute liable for a civil penalty of up to twice the amount of state funds spent on union organizing. §§ 16645.2(d), 16645.7(d). An additional provision permits any state taxpayer — including, of course, a union in a dispute with an employer — to bring a suit under the statute. § 16645.8. Thus, the statute imposes not merely a corrective remedy for the misuse of state funds, but risks imposing an actively punitive sanction on employers engaged in union organizing disputes. The Supreme Court has warned that such punitive measures are of particular concern in the NLRA context. See Gould, 475 U.S. at 288 n. 5, 106 S.Ct. 1057 ("The conflict between the challenged... statute and the NLRA is made all the more obvious by the essentially punitive rather than corrective nature of [the] remedy.")
 
 
 42
 The statute, therefore, both substantially and purposefully alters the balance of forces in the union organizing process, interfering directly with a process protected by the NLRA. We need not decide whether any one aspect of the statute, taken alone, would suffice to warrant preemption. Taken as a whole, the statute constitutes substantive regulation of "Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190 (internal quotation marks omitted). We therefore must hold that it is preempted by federal law.
 
 D. Facial v. As-Applied Challenge
 
 43
 California and the AFL-CIO further argue that preemption should not apply because this is a facial, not an as-applied, challenge, noting that a facial challenge to a statute will be upheld only when a challenger can "establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); see also California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (applying Salerno standard to a statutory preemption case). The Chamber of Commerce responds that this is an as-applied challenge, with the question being whether the statute is invalid as applied to all employers covered by the NLRA. We need not decide whether the Salerno standard applies here, because even if it did sections 16645.2 and 16645.7 would be preempted as to all employers covered by the NLRA.
 
 
 44
 The facial/as-applied distinction would be relevant only if we might find some applications of the statute preempted and others not. In some cases, statutes will have certain applications that do not regulate in an area controlled by the NLRA, and this will be an appropriate distinction. For example, that the City of Los Angeles' use of its franchise power was preempted under the facts of Golden State did not mean that the NLRA preempted the city's ability to franchise taxi companies generally. See 475 U.S. at 619, 106 S.Ct. 1395.
 
 
 45
 Where a party makes a facial Machinists preemption challenge to a statute that directly targets a process established by the NLRA, however, the question is not whether the application of a state statute to a single set of facts is permissible, but whether the state has acted to regulate generally in an area that Congress intended to be "a zone free from all regulations, whether state or federal." Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190. In these circumstances, we are concerned with delimiting areas of potential conflict:
 
 
 46
 potential conflict of rules of law, of remedy, and of administration. The nature of the judicial process precludes an ad hoc inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particularly what exact mischief such a conflict would cause.... Our task is confined to dealing with classes of situations.
 
 
 47
 Garmon, 359 U.S. at 242, 79 S.Ct. 773. Thus, where a state statute is in direct conflict with the NLRA or one of its processes, our focus is the act of regulation itself, not the effect of the state regulation in a specific factual situation.
 
 
 48
 This principle is particularly apposite here, because forcing courts to make case-by-case judgments on the permissible scope of the California statute would encourage some dubious judicial line-drawing. From our Machinists analysis above, it is clear that the statute would be preempted as applied to a private business funded entirely by the state. But would the statute be preempted as applied to a business that receives 25 percent of its funds from the state? What about one that takes only 15 percent of its income from state funds? It is difficult to discern a principled basis upon which to draw these distinctions. Given the Supreme Court's clear instructions about the purposes of labor law preemption, we cannot embrace the legal uncertainty — and resulting litigation — that would arise from a more piecemeal approach.
 
 
 49
 We hold that the California statute is preempted because California has burdened the NLRA through the very act of regulating. There is thus "no set of circumstances ... under which the Act would be valid" as to employers covered by the NLRA. Salerno, 481 U.S. at 745, 107 S.Ct. 2095. Even assuming arguendo that the Chamber of Commerce's preemption challenge is properly characterized as facial, the statute is still pre-empted.
 
 
 50
 E. The First Amendment, State Subsidies and NLRA Preemption
 
 
 51
 We must also consider an analogy California and the AFL-CIO draw from constitutional law. First Amendment jurisprudence distinguishes direct restrictions on speech from instances where the government limits the use of government funds to subsidize speech or conduct. See, e.g., Rust v. Sullivan, 500 U.S. 173, 192-93, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (holding that Congress may require recipients of federal funds to refrain from using those funds to encourage, promote or advocate for abortion as a means of birth control); Regan v. Taxation with Representation of Wa., 461 U.S. 540, 545-46, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (holding that Congress did not violate the First Amendment by denying a tax exemption to groups that engage in lobbying); Lyng v. UAW, 485 U.S. 360, 369, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (holding that the federal government is not required by the First Amendment to subsidize an employee's right to expression on union matters by allowing a striking worker to receive food stamps). These cases hold that the government may choose to subsidize particular speech on particular issues without automatically running afoul of the First Amendment. There is a further distinction between cases "in which the Government has placed a condition on the recipient of the subsidy ..., thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program," and cases in which the government merely restricts the use of its own funds. Rust, 500 U.S. at 196-97, 111 S.Ct. 1759. Although conditions on a grant recipient may violate the First Amendment under the "unconstitutional conditions" jurisprudence, the government is allowed more constitutional latitude in directing the expenditure of its own funds. Id. at 197, 111 S.Ct. 1759.
 
 
 52
 The issue here is not whether California may as a constitutional matter exercise control over its own funds to discourage speech about union organizing. Rather, we must look to see whether Congress intended, when it enacted the NLRA, to allow California to exercise its spending power in this manner. Use of constitutional doctrine in this area is solely by analogy, and we must determine whether California and the AFL-CIO's analogy to the First Amendment is apt. In some NLRA cases, drawing on First Amendment analogies to construe the statute will be appropriate. See Linn, 383 U.S. at 67, 86 S.Ct. 657 (applying constitutional standards in statutory interpretation of the NLRA, but noting that "[w]e deal here not with a constitutional issue but solely with the degree to which state remedies have been pre-empted by the Act").
 
 
 53
 However, First Amendment concepts cannot be imported wholesale in construing the NLRA for the purpose of preemption analysis-especially when to apply constitutional analysis mechanically would substantially alter the balance of forces established by Congress under the statute. We have long recognized that the balance between employer and employee expression established by the NLRA differs substantially from the standard First Amendment balancing of speech interests. See, e.g., NLRB v. Associated Gen. Contractors, Inc., 633 F.2d 766, 772 n. 9 (9th Cir.1980) ("Association that would otherwise be protected [by the First Amendment] may be regulated if necessary to protect substantial rights of employees or to preserve harmonious labor relations in the public interest."); White v. Lee, 227 F.3d 1214, 1236-37 (9th Cir.2000) ("The First Amendment rights of employers in the context of the labor relations setting are limited to an extent that would rarely, if ever, be tolerated in other contexts.... Regulations controlling ... expressive activity[in the labor context] would almost certainly be invalid outside the labor relations setting.") (internal quotation marks omitted). If the unique balance between employer and employee speech established by the NLRA imposes unique constraints on expression by individuals, there is no reason to believe that it does not also impose unique constraints on the ability of states to influence expression through government subsidies.
 
 
 54
 Put simply, we should not assume that Congress would intend to create a carefully balanced "regulation free zone," Golden State, 475 U.S. at 614, 106 S.Ct. 1395, under the NLRA and then permit states to regulate that zone through the device of conditions on state funding. The constitutional analysis of cases like Rust is inapposite in this case.[8] Rather, the question we confront is the same one we would confront in any case of Machinists preemption: does the "`exercise of plenary state authority to curtail or entirely prohibit self-help ... frustrate effective implementation of the Act's processes[?]'" Machinists, 427 U.S. at 147-48, 96 S.Ct. 2548 (quoting Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 380, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969)). For the reasons we have discussed above, we conclude that the California statute does impermissibly interfere with processes that the NLRA meant to leave free from regulation.
 
 F. Federal Grant Programs
 
 55
 California and the AFL-CIO note a number of federal statutes that limit employers' use of specific federal grant or program funds to advocate for or against union organizing. See, e.g., Workforce Investment Act, 29 U.S.C. § 2931(b)(7) (providing that "[e]ach recipient of funds ... shall provide to the Secretary assurances that none of such funds will be used to assist, promote, or deter union organizing."); National and Community Service State Grant Program, 42 U.S.C. 12634(b)(1) ("Assistance provided under this subchapter shall not be used by program participants and program staff to ... assist, promote, or deter union organizing"). California and the AFL-CIO argue that the existence of these statutes is evidence of Congress' desire to permit regulatory schemes such as sections 16645.2 and 16645.7.
 
 
 56
 Although there is again some force to this argument, we are not persuaded that these federal program-grant restrictions were either intended to alter or actually did alter the "wider contours of federal labor policy." Metropolitan Life, 471 U.S. at 753, 105 S.Ct. 2380 (internal quotation marks omitted). Had Congress imposed a federal version of sections 16645.2 and 16645.7 with directly analogous spending restrictions on all federal government grants or expenditure, that would weigh significantly against finding preemption here. See id. at 755, 105 S.Ct. 2380 (inferring from the existence of federal minimum labor standards that Congress did not intend state minimum labor standards to be preempted by the NLRA). But this is not the nature of these few statutes, which — unlike the California statute's spending restrictions that affect all state grants over $10,000 — apply only to certain, specific federal spending. Nor do these federal statutes contain comparable remedial provisions, such as section 16645.8's authorization of citizen suits or the civil penalty imposed by section 16645.2(d). Given the limited application and scope of these federal statutes, we find them to be too ambiguous a basis for inferring congressional intent to permit California's intrusion into the collective bargaining process through sections 16645.2 and 16645.7.
 
 
 57
 Each party shall bear its own costs on appeal.
 
 
 58
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Morrison C. England, Jr., United States District Judge for the Eastern District of California, sitting by designation
 
 
 [1]
 All citations to Cal. Gov't Code §§ 16645-49 are hereinafter cited as,e.g., "section 16645."
 
 
 [2]
 The statute does not require "employers to maintain records in any particular form." § 16648
 
 
 [3]
 Our discussion here is limited to the context of the market participant exception under the NLRA. A market participant exception exists in a number of other contexts, such as cases under the Commerce ClauseSee, e.g., Big Country Foods, Inc. v. Bd. of Educ. of Anchorage, 952 F.2d 1173, 1177-79 (9th Cir.1992) (discussing market participant exception in the dormant Commerce Clause context). We offer no opinion as to the applicability of our reasoning to the market participant exception in these other contexts.
 
 
 [4]
 City of Seward, which was decided before the Supreme Court's decision in Boston Harbor, creates some confusion about the relation of the market participant exception to other NLRA preemption doctrines. City of Seward concluded that "action taken by the state as a market participant is not automatically immune from NLRA preemption." 966 F.2d at 495. Boston Harbor, however, held explicitly that the "[NLRA] pre-emption doctrines apply only to state regulation" and it plainly held that "a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor." 507 U.S. at 227, 229-30, 113 S.Ct. 1190. Boston Harbor, therefore, makes clear that once a state's action falls within the "market participant" exception, it is entirely protected from preemption under the NLRA. Therefore to the extent that City of Seward states otherwise, we hold that it has been overruled. See Miller v. Gammie, 335 F.3d 889, 900 (9th Cir.2003) (en banc) (holding that we may overrule prior circuit precedent without taking a case en banc when the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable"). Of course, as we hold here, a state may enact "regulation" through the use of its spending power.
 
 
 [5]
 This case is thus distinct fromAlameda Newspapers, where we concluded that a city's proclamation of support in favor of a labor union in an ongoing strike at a local newspaper, as well as the city's decision to refrain from purchasing advertisements and to cancel its subscriptions as a result of the strike, was not regulation subject to NLRA preemption. 95 F.3d at 1409. We emphasized the merely exhortatory nature of the proclamation, noting that "[t]he resolution has no binding force on anyone." Id. at 1414. We also noted that the cancellation of the subscriptions and refusal to advertise did not "have some `real effect' or practical economic impact on the employer that is either different from that of the ordinary customer or is otherwise governmental in nature." Id. at 1416.
 
 
 [6]
 We do not decide here whether such open debate on unionization is an affirmative right that the NLRA itself "protects" or "arguably protects," which would be necessary predicates for a finding ofGarmon preemption. See Golden State, 475 U.S. at 613, 106 S.Ct. 1395 (explaining that Garmon preemption prohibits states from regulating "activity that the NLRA protects, prohibits, or arguably protects or prohibits"). Our holding rests entirely on the belief that California is preempted under Machinists from regulating pro-or anti-unionization advocacy because such regulation interferes with the process protected by the NLRA, not any specific right protected by the statute.
 
 
 [7]
 We also note thatGarmon permits considerable latitude to states to enforce traditionally local law. "Under Garmon, a state may regulate conduct that is of only peripheral concern to the Act or that is so deeply rooted in local law that the courts should not assume that Congress intended to pre-empt the application of state law." Belknap, 463 U.S. at 509, 103 S.Ct. 3172.
 
 
 [8]
 We also note that First Amendment doctrine is not as supportive of an unfettered ability of California to control its spending as California and the AFL-CIO suggest. Although the government is, when it is engaging in "governmental speech," entitled to a very substantial ability to condition the use of its own funds, where the party funded is "not the government's speaker" and the relevant advocacy "cannot be classified as governmental speech even under a generous understanding of the concept" the analysis differs from that ofRust. See Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 541-43, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). Although we offer no opinion as to how California's restrictions would fare under constitutional analysis, state regulation is not automatically immune from First Amendment concern simply because that regulation comes in the form of a subsidy rather than a prohibition.