BEEZER, Circuit Judge,
with whom KLEINFELD and CALLAHAN, Circuit Judges,
join in dissent:
May a state leverage its spending power to induce an employer to adopt a neutral policy toward labor union organizing? The First Amendment, the National Labor Relations Act (“NLRA” or “the Act”), and well-established doctrines of preemption, demand an answer in the negative.
By extending the definition of “state funds” to include any monies received by a private employer as a result of contracting with the state, AB 1889 strikes at the heart of the First Amendment. AB 1889 prohibits not just the use of state money granted to an employer for and under a specific program but also co-opts the payment for goods and services and profit realized under a contract (undoubtedly not state funds). AB 1889’s gag rules prevent any employer from spending its own funds in direct violation of the First Amendment.
The NLRA extends to employees the opportunity to render a free and informed choice about union representation. In doing so, the Act allows for robust debate of union representation issues by employers and employees alike. California Assembly Bill 1889, codified at Cal. Govt.Code §§ 16645-49, (“AB 1889” or “the statute”), stifles employers from fully participating in organizing and exercising the rights that are. explicitly granted to them by Congress under the NLRA. The statute rides roughshod over the delicate balance established by Congress between labor unions and employers. In addition, the California statute interferes with the NLRA’s extension of exclusive jurisdiction to the National Labor Relations Board (“NLRB”) for the adoption and enforcement of representation election rules. I would hold the federal preemption of the relevant provisions of the California statute to be complete.
I
AB 1889 is far from a neutral enactment that simply restricts use of undefined “state funds.” It abrogates the First Amendment rights of employers to speak out and discuss union organizing campaigns. Under the guise of preserving state neutrality, the statute operates to impel employers themselves to take a position of neutrality with respect to labor relations, in direct conflict with employers’ rights under the First Amendment.
AB 1889 applies to any vendor of goods or services who receives payouts from the State of California “in excess of ten thousand dollars in any calendar year on account of its participation in a state program.” “State program” is not defined in the statute and this broad language brings under the auspices of the statute every purveyor of goods or services unlucky enough to cross the magic $10,000 threshold in its annual contracting with the state.[1] AB 1889’s speech regulations and *1099 presumption that “state funds” have been spent on union-related expenditures allows the state to irrevocably stamp dollar bills with “Property of California,” alter their use as legal tender and limit the items an employer may purchase with those specific dollar bills. All this, despite the fact that the employer has fully performed under a contract and the state has received every item it is entitled to under the terms of the contract. AB 1889 writes a neutrality provision into every contract the state enters into without requiring the state to bargain or pay for such a pricey concession. The statute also fails to state where an employer may turn to recover any compliance costs that a labor organization may recover in a suit authorized by the Act — another unbargained for benefit gained by the state.
A statutory blanket prohibition on employers advocating for or against unions would blatantly violate the First Amendment as the state has no legitimate interest in prohibiting employers from speaking on union issues. Even the opinion of the court recognizes that the statute only passes constitutional muster if it is read to only apply to state funds. Opinion of the Court at 11794 (“Nor does it interfere with employers’ exercise of their First Amendment rights, because employers remain free to use their own funds to advocate for or against unionization and are not required to accept neutrality as a condition for receipt of state funds.”). Just because the majority closes it eyes and wishes it were so cannot alter the economic fact that AB 1889 both explicitly and implicitly does unconstitutionally require neutrality as a condition for contracting with the state. A state could not terminate a contract due to the contractor’s speech, nor could it decide not to contract based on the employer’s speech as either decision would violate the employer’s First Amendment Rights. Board of County Comm’rs, Wabaunsee County, Kansas v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (Government cannot retaliate against independent contractors for exercising First Amendment Rights).
Once the state has chosen to award a contract to the lowest responsible bidder, the state’s interest in the funds it pays for the contracted goods and services is at end. It has made a bargain for the provision of a limited set of benefits and the vendor has agreed to provide those goods and services, including labor, in exchange for money. Once the exchange has been made and payment has been received, that money can no longer be considered “state funds.” The state has no interest in how those funds are spent by the vendor and the state has no 11810 right or reason to limit an individual who engages in a labor dispute from using its own money for any lawful purpose. Upon payment to the employer those funds became free tender and any attempt by the state to undermine the buying power of free tender by limiting the types of goods that can be purchased with funds in which the state is not vested with a residual interest is fundamentally opposed to the basic tenants of our economic system and the First Amendment.
Every reasonable employer will also have built into its contract a measure of profit. This profit is the earned compensation of the employer upon completion of its contractual duties. AB 1889 seeks to condition the uses to which an employer *1100 may put these specific funds. The problems with this profit-taking are most stark when considering the case of employers who conduct all of their business with the state. These employers can offer their employees bonuses, pay for all-inclusive vacations to Tahiti, throw extravagant parties with champagne and caviar, or simply bank their profits to save for a rainy day. What they cannot do, according to AB 1889, is hold a mandatory meeting to discuss unionization (either the benefits or burdens) with their employees. Employers who receive all of their revenue from the state have no other option but to cease all union-related speech. The opinion of the court has no mercy for these employers as it concludes that they have made their own bed through their “free-market choice.” Simply because a business or individual chooses to contract with the state, or even accept employment from the state, does not mean that the state may abrogate First Amendment rights. See, e.g. United States v. National Treasury Employees Union, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Free market choice or not, these employers retain their First Amendment right to spend their own funds, as they undoubtedly earn by contracting with the state, as they see fit.
Because AB 1889 commandeers private employers own funds, in addition to regulating the use of state funds, I would hold that the statute is overly broad and unconstitutional under the First Amendment.
II
The NLRA is a comprehensive scheme designed to balance the rights and interests of both employers and employees and provides an administrative mechanism to resolve questions concerning union representation. Recognizing the extreme importance of the free flow of information, the NLRA explicitly protects rights of employers to express their views on union organizing efforts. The opinion of the court recognizes the importance of unrestricted speech and the free flow of information to the proper enactment of the Act but blithely and naively concludes that the California statute does not impede the flow of information to employees by regulating employers’ speech. It ignores the application of AB 1889 to employers own funds, the intensely burdensome and one-sided regulatory scheme and the actual impact of the statute as amply demonstrated in the record.
A.
Congress’ intent to protect the free-flow of information between employers and employees is embodied in Section 8(c) of the Act, which permits employers to articulate, in a non-coercive manner, their views regarding union organizing efforts:
The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this sub-chapter, if such expression contains no threat of reprisal or force or promise of benefit.
29 U.S.C. § 158(c). Congress added Section 8(c) of the NLRA in 1947, “to insure both to employers and labor organizations full freedom to express their views to employees on labor matters.... ” S. Rep. 80-105, at 23 (1947). Indeed, the explicit purpose of Section 8(c) was “to protect the right of free speech when what the employer says or writes is not of a threatening nature or does not promise a prohibited favorable discrimination.” H.R.Rep. No. 80-510 (1947), reprinted in 1947 U.S.Code Cong. Serv. 1135, 1151.
The United States Supreme Court recognizes that “the enactment of § 8(c) manifests a congressional intent to encourage free debate on issues dividing labor and *1101 management.” Linn v. United Plant Guard Workers, Local 114, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966). The Court also holds that “an employer’s free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board.” NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The Congressional enactment of Secion 8(c), the Court explains, in conjunction with the First Amendment, allows employers to express “any of [their] general views about unionism or any of [their] specific views about a particular union” in a non-coercive manner. Id. at 618, 89 S.Ct. 1918.
Our case law has also consistently emphasized the importance of an employer’s freedom of speech in labor relations matters. “Freedom of speech is an essential component of the labor-management relationship. Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in ‘uninhibited, robust, and wide-open’ debate.” Steam Press Holdings v. Haw. Teamsters & Allied Workers Union, Local 996, 302 F.3d 998, 1009 (9th Cir.2002) (quoting New York Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). For a concise and accurate statement of the rule, we adopted the principle of free speech in union representation matters as crafted by the Fifth Circuit:
The guaranty of freedom of speech and assembly to the employer and to the union goes to the heart of the contest over whether an employee wishes to join a union. It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available.
NLRB v. TRW-Semiconductors, Inc., 385 F.2d 753, 760 (9th Cir.1967) (quoting Southwire Co. v. NLRB, 383 F.2d 235, 241 (5th Cir.1967)).
Our opinions have faithfully reiterated a “commit[ment] to the principle that debate in union campaigns should be vigorous and uninhibited,” so long as the debate is free of coercion and retaliatory threats. NLRB v. Lenkurt Elec. Co., 438 F.2d 1102, 1108 (citing NLRB v. TRW-Semiconductors, Inc., 385 F.2d 753, 759-60 (9th Cir.1967)). “The exercise of free speech in these campaigns should not be unduly restricted by narrow construction. It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right.” Id.; accord, Montgomery Ward & Co. v. NLRB, 385 F.2d 760, 763 (8th Cir.1967) (“[T]he right of free speech guaranteed by the First Amendment and § 8(c) of the Act should not be defeated by narrow or strained construction.”).
This protection of the speech of both employees and employers is the heart of Congress’ design to protect and enhance union organizing. The NLRB supports this congressional policy of free speech, holding “that it will not restrict the right of any party to inform employees of the advantages and disadvantages of unions and of joining them as long as such information is imparted to employees in a non-coercive manner.” Trent Tube Co., 147 NLRB 538, 541 (1964) (internal quotation marks omitted); see also United Technologies Corp., 274 NLRB 1069, 1074 (1985) (“[A]n employer has a fundamental right, protected by Section 8(c) of the Act, to communicate with its employees concerning its position in collective-bargaining negotiations and the course of those negotiations.” (footnote omitted)).
*1102 B.
AB 1889 prohibits grantees and private employers from using funds received from the state “to assist, promote, or deter union organizing,” which is defined to include “any attempt by an employer to influence the decision of its employees in this state or those of its subcontractors regarding ... [w]hether to support or oppose a labor organization ... or [w]hether to become a member of any labor organization.” Cal. Gov’t Code §§ 16645(a), 16645.2(a), 16645.7(a). The prohibited expenditures include the payments by an employer for legal and consulting fees relating to union organizing efforts as well as the salaries of supervisors and employees related in any respect to union organizing efforts. § 16646. The statute exempts several types of pro-union activities and expenses from the prohibition, including “[aiddress-ing a grievance or negotiating or administering a collective bargaining agreement” and “[njegotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization.” §§ 16647(a), (d).
The statute entails burdensome and detailed record-keeping. The statute requires that employers and grantees certify in advance that the state funds will not be used for speech and activities that are related to union organizing. §§ 16645.2(c), 16645.7(b). In addition, employers and grantees must maintain detailed records showing that none of the funds have been used for speech regarding labor relations. §§ 16645.2(c), 16645.7(c). Those records must be made available to the Attorney General upon request. Id. The statute presumes that, where funds are commingled, state funds were used to assist, promote, or deter union organizing. § 16646(b).
The enforcement provisions place heavy burdens on affected employers. The statute renders employers and grantees liable for treble damages (i.e., the amount of state funds that were expended in violation of the statute, plus a civil penalty equal to twice the amount of those funds). §§ 16445.2(d), 16445.7(d). The Attorney General of California, or any private taxpayer, may file a lawsuit against a suspected violator “for injunctive relief, damages, civil penalties, and other appropriate equitable relief.” § 16645.8(a). The statute awards a prevailing plaintiff, or certain prevailing taxpayer intervenors, attorney’s fees and costs. § 16645.8(d). The statute does not award any attorney’s fees or costs to a prevailing employer. By creating seemingly impossible compliance burdens, by means of onerous accounting requirements and the threat of lawsuits, the statute essentially mandates employer neutrality. The statute effectively halts employer campaigns to defeat labor organizing activity or even an employer’s ability to offer an opinion on the merits of one union versus another. Similar to neutrality agreements, which are often sought by unions from employers, the California statute pushes employers to a policy of neutrality, which in turn helps facilitate union organizing. It is no surprise that the California statute was sponsored by the California Labor Federation, AFL-CIO, and supported by a phalanx of labor unions. Sen. Comm, on Industrial Relations, Comm. Rep. for 1999 Cal. Assemb. B. No. 1889, 1999-00 Reg. Sess., at 1 (June 28, 2000). Equally telling, a law firm which represented itself as “the largest Union-side labor law firm on the West Coast” wrote in a letter to the California Attorney General that AB 1889, if not halted by a court, would “have a significant positive effect on various [union] organization drives.... ”
The statute carries a false air of even-handedness. It purports to limit employers from using state funds to either “promote” union organizing or “deter” union *1103 organizing. §§ 16645.2(a), 16645.7(a). What must be understood, of course, is that few, if any, employers will wish for their employees to vote for union representation. Rare, indeed, will the circumstance be where an employer will actually dedicate resources to encourage its employees to unionize. The California Teamsters revealed the true impact of the legislation in a letter to certain members of the California legislature when AB 1889 was under consideration. The California Teamsters Public Affairs Council “urged [an] ‘aye’ vote on AB 1889” because it “prohibit[s] employers who receive state funds from using those funds to discourage unionization” and will affect the “all too common practice” of “employer campaigns to defeat labor organizing activity.” (emphasis added).
The compliance provisions are daunting. Employers must maintain records demonstrating a complete separation of state funds. These records must identify every expense at all related to a union organizing campaign, save for a few pro-union exceptions, and prove conclusively that such expenses do not derive from state funds. §§ 16645.2(c), 16445.7(c), 16646, 16647. The statute creates a presumption that the employer used state funds for unionization purposes unless proven otherwise. § 16646(b). This presumption applies even when an employer has sufficient private funds such that no state funds were actually expended. Id. The statute’s documentation demands, which require employers to track every moment of employee time and every expense that somehow relates to deterring union organizing efforts, operate to inhibit employers from opposing union representation drives at all.
To comply with the statute and continue to oppose unionization or speak out on the merits of one union versus another, an employer must create and maintain two completely separate accounting and payroll systems. This becomes necessary because the California statute requires the employer to monitor public and private funds and ensure that the statute’s mandate of fund separation is fulfilled. In addition, the statute requires the employer to engage in the virtually impossible task of allocating every single employer expense related to union organizing activity, including supervisor time and employee time, which must be meticulously logged and tracked.
The record before us shows that labor unions have leveraged the significant compliance burdens of the statute to enhance their bargaining position as against employers. After AB 1889 passed, unions began writing to the California Attorney General’s office, alleging violations of the statute in an effort to coerce employers to abstain from distributing literature, retaining consultants and legal counsel, or otherwise communicating with employees about the advantages and disadvantages of employment in a union shop. One union wrote the Attorney General and alleged that an employer violated the statute because employees who were attending a mandatory meeting about union organizing were not paid with a separate paycheck for time that each employee spent at the meeting. Another union alleged a violation of the statute, with little factual support, but offered to “settle” the alleged violation if the employer agreed to enter into a neutrality agreement with the union. Yet another union alleged that an employer violated AB 1889 by hiring an attorney to represent it during an organizing drive without arranging to pay for these legal services from funds that were conclusively derived from a source other than the state. The attempts by the AFL-CIO, in briefs filed in this appeal, to downplay the decidedly pro-union impact of AB 1889 are belied by the record before the court. What that record teaches is that the unions’ have and will aggressively use AB 1889 to gain *1104 a special advantage in labor disputes and thereby alter the balance of power between unions and employers.
In light of these burdens and this record it cannot be said with a straight face that the statute “does not affect an employer’s ability to use its own funds in connection with union organizing activity.” Opinion of the Court at 1090. The significant and undeniable impact AB 1889 has on employers’ speech rights means that not only does it violate the First Amendment, but it is undoubtedly preempted by the NLRA.
Ill
The Supreme Court’s preemption doctrines as they relate to the NLRA have long been centered around reinforcing the “purpose of the Aet[, which] was to obtain ‘uniform application’ of its substantive rules and to avoid the ‘diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.’ ” NLRB v. Nash-Finch Co., 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971) (quoting Garner v. Teamsters Union, 346 U.S. 485, 490, 74 S.Ct. 161, 98 L.Ed. 228 (1953)). The Court has articulated “two distinct NLRA pre-emption principles” as expressed in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (“Garmon preemption”), and Machinists v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (“Machinists preemption”). Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 748, 748-49, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).
I would hold that the preemption doctrines established in Garmon and Machinists completely preempt the relevant provisions of the California statute.
A.
The doctrine of “Machinists pre-emption preserves Congress’ intentional balance between the uncontrolled power of management and labor to further their respective interests.” Bldg. & Trades Council v. Associated Builders (“Boston Harbor”), 507 U.S. 218, 226, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (internal quotation marks omitted). Although cast nominally as an effort to ensure state neutrality, the California statute, by stifling speech rights of employers and their ability to participate in a debate about the value of unions generally or advise employees as to which union is preferable, operates to significantly empower labor unions as against employers. In doing so, the statute destroys the delicate balance between labor unions and employers as mandated by Congress through the NLRA. For this initial reason, AB 1889 is preempted by the NLRA, pursuant to Machinists v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976).
Machinists preemption “is based on the premise that ‘the use of economic pressure by the parties to a labor dispute is ... part and parcel of the process of collective bargaining,’ ” which means that “neither a state nor the National Labor Relations Board is ‘afforded flexibility in picking and choosing which economic devices of labor and management shall be branded unlawful.’ ” Alameda Newspapers, Inc. v. City of Oakland, 95 F.3d 1406, 1413 (9th Cir.1996) (quoting Machinists, 427 U.S. at 144, 149, 96 S.Ct. 2548).
Under the doctrine of Machinists preemption, a state cannot “deny[ ] one party ... a weapon that Congress meant him to have available,” because such a state regulation “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Machinists, 427 U.S. at 150, 151, 96 S.Ct. 2548 (internal quotation marks omitted). Employers have a number of tools at *1105 their disposal in exercising their Section 8(c) rights to express their views on union organizing efforts. An employer is permitted, for example, to express its views about union representation to masses of employees, in mandatory meetings, on company time, so long as such speech does not occur within 24 hours of an election. See Peerless Plywood Co., 107 NLRB 427, 429 (1953); Livingston Shirt Corp., 107 NLRB 400, 409 (1953). Employers may dispatch supervisors to engage in one-on-one discussions during work time with employees about the negative effects of union representation, see, e.g., Lenkurt Elec. Co., 438 F.2d at 1107-08, and may disseminate written anti-union materials, Beverly Enterprises-Hawaii, Inc., 326 NLRB 335, 336 (1998) (holding that “the [ejmployer did not engage in objectionable conduct when its supervisors handed out flyers [even] at a time when the [e]mployer was enforcing its otherwise valid no-distribution rule against employees”).
A state law that both explicitly targets and directly regulates processes controlled by the NLRA is preempted under the Machinists doctrine. Because AB 1889, on its face, directly regulates the union organizing process itself and imposes substantial compliance costs and litigation risk on employers who participate in that process using the statutorily protected self-help mechanisms, it interferes with an area Congress intended to leave free of state regulation. The statute hands a coercive weapon to those seeking to unionize by creating an ever present threat of consuming and expensive litigation should an employer deign to offer its opinion on the merits of unionization. The statute ties the hands of management financially and allows pro-union groups free reign.[2]
Preemption will prevail over the application of local law even when federal law does not expressly protect the conduct at issue if “the application of state law ... would operate to frustrate the purpose of the federal legislation.” Teamsters v. Morton, 377 U.S. 252, 258, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964) (noting also that a conflicting state law cannot be permitted to “frustrate the congressional determination to leave th[e] weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy”). Machinists affirms this notion, holding that “a particular activity might be protected by federal law not only when it [is explicitly protected by the NLRA], but also when it was an activity that Congress intended to be unrestricted by [a]ny governmental power to regulate.” 427 U.S. at 141, 96 S.Ct. 2548 (internal quotation marks omitted).
An overriding principle of the NLRA is that the collective bargaining process cannot function unless both employers and employees have the ability to engage in open and robust debate concerning unionization. See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 *1106 L.Ed. 893 (1937) (“The theory of the Act is that free opportunity for negotiation ... may bring about the adjustments and agreements which the Act in itself does not attempt to compel.”). The NLRA’s declared purpose is to “restor[e] equality of bargaining power” by, among other ways, “encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of them employment.” 29 U.S.C. § 151.
By impeding the flow of information and any substantive discussion of unionization, the statute substantively regulates and disrupts “Congress’ intentional balance between the uncontrolled power of management and labor to further their respective interests.” Boston Harbor, 507 U.S. at 226, 113 S.Ct. 1190 (internal quotation marks omitted). The statute frustrates “effective implementation of the [NLRA’s] processes,” rendering pre-emption of the California statute under Machinists appropriate. Machinists, 427 U.S. at 148, 96 S.Ct. 2548 (internal quotation marks omitted).
That California purports to act through its spending power rather than its regulatory power, is a “distinction without a difference.” Wisconsin Dep’t of Indus. v. Gould, Inc., 475 U.S. 282, 287, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). “[W]e cannot believe that Congress intended to allow States to interfere with the ‘interrelated federal scheme of law, remedy, and administration,’ under the NLRA as long as they did so through exercises of the spending power.” Id. at 290, 106 S.Ct. 1057 (quoting Garmon, 359 U.S. at 243, 79 S.Ct. 773) (citation omitted). Although a state’s ability to control the use of its funds is an important state interest, regulation that specifically targets and substantially affects the NLRA bargaining process will be preempted, even if such regulation comes in the form of a restriction on the use of state funds. See Metropolitan Milwaukee Assn. of Commerce v. Milwaukee County, 431 F.3d 277, 278-79 (7th Cir.2005).
B.
The doctrine of Garmon preemption exists to uphold national labor policy and to vindicate Congress’ decision to “entrust[] administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience.” San Diego Building Trades Council v. Garmon, 359 U.S. 236, 242, 246, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). The California statute stifles employers’ speech rights which are granted by federal law, and in doing so, impedes the ability of the NLRB to uphold its election speech rules and administer free and fair elections. I would hold that AB 1889 is also preempted under the Gar-mon doctrine.
In upholding the NLRA from state-law dilution, the Supreme Court has emphasized the importance of “delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered.” Garmon, 359 U.S. at 246, 79 S.Ct. 773. Garmon preemption is focused on avoiding “the potential conflict of two law-enforcing authorities, with the dis-harmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes.” Id. at 242, 79 S.Ct. 773.
There are two distinct circumstances under which Garmon preemption can emerge. Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters, 436 U.S. 180, 187, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). The first preempts *1107 activity which is actually protected or prohibited by federal law, dictating that “[w]hen it is clear 11823 or may fairly be assumed that the activities which a State purports to regulate are protected [by the NLRA], due regard for the federal enactment requires that state jurisdiction must yield.” Garmon, 359 U.S. at 244, 79 S.Ct. 773. The second form of Garmon preemption deals with activities that are merely either arguably protected or arguably prohibited by the Act. Sears, 436 U.S. at 187-88, 98 S.Ct. 1745. This second and distinct application of Garmon preemption holds that “[w]hen an activity is arguably subject [to the Act], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.” Garmon, 359 U.S. at 245, 79 S.Ct. 773 (emphasis added).
The first branch of the Garmon preemption doctrine is at issue, and preempts AB 1889. Congress’ intent, the Supreme Court and Ninth Circuit precedent all lead inextricably to thé conclusion that Section 8(c) of the NLRA actually grants and protects speech rights of employers. See supra § I. Because the Act is a comprehensive regulatory scheme, to say that an activity is not punishable by the Act is the equivalent of protecting that activity. AB 1889 encumbers these speech rights, and in doing so, interferes with the jurisdiction of the NLRB. Congress has directed the NLRB to oversee elections and determine what conduct constitutes an unfair labor practice under the Act. See 29 U.S.C. § 158(a)(1). Broadly speaking, and consistent with Section 8(c) of the NLRA, the NLRB takes a laissez faire approach to employee and employer speech, allowing passionate, partisan debate to proceed during a union organizing campaign. See Trent Tube Co., 147 NLRB 538, 541 (1964). At the same time, the NLRB has jurisdiction to regulate a certain bandwidth of employer speech, .to ensure compliance with Section 8(c). See Midland Nat’l Life Ins. Co., 263 NLRB 127, 133 (1982) (“[W]e will no[t] probe into the truth or falsity of the parties’ campaign statements, and [] will not set elections aside on the basis of misleading campaign statements.... [But] we will continue to protect against other campaign conduct, such as threats, promises, or the like, which interferes with employee free choice.”). For example, the NLRB has long enforced various “time, place, and manner” rules that bar certain types of campaign and speech activities in the vicinity of the polls or in the final hours before an election. See Peerless Plywood Co., 107 NLRB at 429-30; Milchem, Inc., 170 NLRB 362, 362-63 (1968). The NLRB has held that, consistent with Section 8(c), employers may hold mandatory meetings with employees about union organizing efforts, Livingston Shirt Corp., 107 NLRB at 409, direct supervisors to informally discuss a representation campaign with employees, see Stanley Oil Co., 213 NLRB 219, 225 (1974), and distribute anti-union literature to employees even when enforcing a no-solicitation rule to employees, Beverly Enterprises-Hawaii, 326 NLRB at 336.
The California statute regulates the same partisan employer speech that Congress committed to the jurisdiction of the NLRB. In doing so, AB 1889 discourages employer speech, which works at cross-purposes with the relaxed election speech rules established by the NLRB. Congress “entrusted [to the NLRB] ... a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.” NLRB v. A.J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322 (1946). By discouraging employer speech, California directly usurps the ability of the NLRB to adminis *1108 ter elections that will foster fair and free employee choice.
Far from hewing to the NLRA’s goal of installing a “national labor policy of minimizing industrial strife,” Emporium Capwell Co. v. W. Addition Cmty. Org., 420 U.S. 50, 62, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975), AB 1889 encourages additional litigation by allowing unions and the California Attorney General to bring proceedings in state court to attack the very partisan employer speech that the NLRB protects. California defies Congress’ decision to “entrust] to the Board alone” the criteria necessary to conduct a fair representation election. NLRB v. Waterman S.S. Corp., 309 U.S. 206, 226, 60 S.Ct. 493, 84 L.Ed. 704 (1940).
“Garmon preemption is ‘intended to preclude state interference with the National Labor Relations Board’s interpretation and active enforcement of the integrated scheme of regulation established by the NLRA.’ ” Alameda Newspapers, 95 F.3d at 1412 (quoting Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 613, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986)); see also Gould, 475 U.S. at 286-89, 106 S.Ct. 1057. California’s displacement of the NLRA’s free speech protections and its interference with the NLRB render AB 1889 preempted under Gar-mon. Garmon preemption applies because AB 1889 “regulate[s] conduct so plainly within the central aim of federal regulation [that it] involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law,” thus creating a “potential frustration of national purposes.” Garmon, 359 U.S. at 244, 79 S.Ct. 773.
The opinion of the court avoids general Garmon pre-emption principles and replaces them with an overly narrow view of the Garmon doctrine that is inapplicable to this dispute. The critical error of the opinion of the court lies in a misreading of Sears, Roebuck & Company, 436 U.S. 180, 98 S.Ct. 1745, and a misunderstanding of the form of Garmon preemption that applies to AB 1889.
The opinion of the court relies upon Sears for the proposition that Garmon preemption applies only when the controversy presented to the state court is identical to the controversy that would be presented to the NLRB. The opinion of the court fails to recognize, however, that this requirement of identicalness applies only to the type of Garmon preemption applied to those activities that are merely arguably prohibited by the Act. Because of heightened concerns rooted in the Supremacy Clause of the United States Constitution, the requirement of identicalness does not apply if the activity is either arguably protected or, as here, actually protected, by the Act. An analysis of Sears readily uncovers the misconception of the Garmon doctrine as expressed in the court’s opinion filed today.
At issue in Sears was the power of a state court to hear a trespass lawsuit brought by an employer to enforce trespassing laws against union picketing. Sears, 436 U.S. at 182, 98 S.Ct. 1745. The Court first considered whether the picketing was “arguably prohibited ” by federal law, which would be possible grounds for preemption. Id. at 190-98, 98 S.Ct. 1745 (emphasis added). The Court concluded that, with regard to activity which is arguably prohibited by the Act, Garmon preemption (and the accompanying risk of interference with the jurisdiction of the NLRB) emerges only when “the controversy is identical to ... that which could have been, but was not, presented to the Labor Board.” Id. at 197, 98 S.Ct. 1745. The Court concluded that the NLRB’s inquiry regarding the arguably prohibited conduct would prove to be vastly different than an inquiry by the state court as to *1109 whether there was a trespass, and therefore, declined to find Garmon preemption.
The Court then turned to the question whether the arguably protected character of the union’s picketing could lead to Gar-mon preemption. Id. at 199-207, 98 S.Ct. 1745. Preliminarily, the Court noted that “state-court interference with conduct actually protected by the act” invokes a “constitutional objection” rooted in the Supremacy Clause. Id. at 199, 98 S.Ct. 1745. Therefore, “[considerations of federal supremacy ... are implicated to a greater extent when labor-related activity is protected than when it is prohibited.” Id. at 200, 98 S.Ct. 1745. The Court concluded that even though the Union’s peaceful, if trespassory, picketing could arguably be protected under the Act, such a trespass “is far more likely to be unprotected than protected.” Sears, 436 U.S. at 205, 98 S.Ct. 1745. Therefore, the Court held, “the assertion of state jurisdiction [to adjudicate the alleged trespass] does not create a significant risk of prohibition of protected conduct.” Sears, 436 U.S. at 207, 98 S.Ct. 1745. Notably, with regard to the arguably protected conduct of the picketing and trespass, the Court did not require (as it did with respect to arguably prohibited conduct) that the controversies before the NLRB and state court be identical before invoking Garmon preemption.
As this analysis of Sears indicates, the rule that Garmon preemption applies only when the state court and NLRB inquiries are identical only applies to activity which is arguably prohibited under the Act. With regard to conduct that is arguably protected under the Act, the standard under which preemption is found becomes less stringent because of heightened federal supremacy concerns. Accordingly, as compared to activity which is merely arguably prohibited by the Act, Garmon preemption is more readily found in relation to activity which is arguably protected or actually protected by the Act. 436 U.S. at 199-200, 98 S.Ct. 1745.
At issue with regard to AB 1889 is not a mere arguable prohibition or arguable protection granted by the NLRA. Rather, Section 8(c) of the NLRA constitutes an explicit, actual protection which explicitly protects the speech rights of employers.
All along, the Sears Court explicitly disclosed that it was not addressing a case that involved actually protected conduct. Sears, 436 U.S. at 187, 98 S.Ct. 1745 (“The case is not, however, one in which ‘it is clear or may fairly be assumed’ that the subject matter which the state court sought to regulate ... is either prohibited or protected by the Federal Act.”). In light of the explicit speech protections granted by Section 8(c) of the NLRA, the Sears test of strict identicalness does not apply to a Garmon preemption analysis of AB 1889. Simply put, the opinion of the court’s reliance on Sears, and its application of the test of identicalness between the NLRB’s inquiry and the state court’s inquiry, is misplaced.
The traditional Garmon analysis applies to the explicitly protected free speech rights of employers, and because AB 1889 interferes with those rights and undermines the speech rules and election procedures of the NLRB, I would hold that AB 1889 is preempted under Garmon.
IV
I must respectfully dissent because AB 1889 violates the First Amendment and is preempted under both Machinists and Garmon. The District Court properly entered summary judgment in favor of plaintiffs.

. The term contracting may suggest a more narrow application than that intended by AB 1889. AB 1889, as written, takes a programmatic approach to controlling the labor-man *1099 agement arena through its extensive reach to all businesses who have a financial involvement in state regulated activities. For example, hospitals or nursing homes that accept MediCal patients (a state program) are likely to receive over $10,000 in payments from California. The acceptance of these state payments subjects those payments and that vendor to the strictures of AB 1889.

. I note an additional manner in which AB 1889 alters the balance as established between labor unions and employers: AB 1889 comes dangerously close to rendering employers’ financial records an open book, which federal labor law does not allow. Labor unions are permitted to receive employers’ financial records under the NLRA only after winning an election and only for legitimate collective bargaining purposes. See NLRB v. Acme Industrial Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). Under AB 1889, however, unions are able to bypass these federal limits and file lawsuits in state court, granting them access to employers’ financial records in state court. With these records in hand, the unions would have additional leverage in advocating for a unionized workforce and place additional pressure on an employer to simply recognize a given union.